SNIDER, Respondent, *v.* CARMICHAEL, Appellant.

(No. 7,518.)

(Submitted April 22, 1936.   Decided May 28, 1936.)

· [58 Pac. (2d) 1004.]

Messrs. *Belden & DeKalb* and *Mr. C. W. Robison,* for A'ppellant, submitted a brief; *Mr. H. Leonard. DeKalb* argued the cause orally.

*Mr. E. K. Cheadle* and *Mr. George E. Hurd,* for Respondent, submitted a brief; *Mr. Hurd* argued the cause orally.

392

MR. JUSTICE MORRIS delivered the opinion of the court.

This is an action to terminate a contract between the parties, for an accounting, and for a division of assets, or the sale of the assets and division of the proceeds thereof.

For several years prior to November 1, 1930, the defendant was the owner of several bands of sheep which were let to various parties in Fergus and adjoining counties to be run on shares. One band was let to the plaintiff. On November 1, 1930, the defendant owned and had let out approximately 11,000 sheep, all breeding ewes except 1,600 ewe lambs, and on that date the plaintiff and defendant entered into the contract hereafter recited and referred to as Exhibit A of the complaint. The contract provided that the business should be carried on for one year and might be continued by mutual agreement for an additional year. The record does not show that the additional year was expressly agreed to on the termination of the year covered by the contract, but the business was continued without change until April 1, 1933, at which time the second contract, Exhibit B of the complaint, hereafter recited, was agreed upon, but was not executed until July 29, 1933.

The contracts, being the best evidence of the intention of the parties, are set out in full, as follows:

"Exhibit A.

"Agreement.

"This Agreement made and entered into in duplicate this 1st day of November, A. D. 1930, by and between E. W. Carmichael of Lewistown, Montana, the party of the first part and

Ray Snider of Lewistown, Montana, the party of the second part, Witnesseth:

"The party of the first part for and in consideration of the covenants and conditions herein contained has agreed to sell and the party of the second part for and in consideration of the covenants and conditions herein contained has agreed to buy an undivided one-half interest in all of the sheep now owned by the party of the first part upon the terms and conditions hereinafter set forth.

"The sheep now owned by the party of the first part are more particularly described as follows: [The list of names of persons to whom the sheep were let and the number in possession of each is omitted, the total having been mentioned above.]

"All bucks belonging to the first party which have been and may hereafter be delivered to any and all of the various parties to whom sheep have been delivered under the various contracts hereinbefore mentioned.

"All of said sheep branded with a black paint cross on the back and all sheep hereafter acquired by the parties hereto and the increase of said sheep hereinabove mentioned to bear the same brand.

"It is mutually agreed between the parties hereto that the party of the first part agrees to sell and the party of the second part agrees to buy an undivided one-half interest in the sheep now out on the various contracts hereinabove mentioned subject to all of the terms, provisions and conditions of each of the said contracts hereinabove mentioned.

"The party of the second part agrees to pay for the said interest in all of said sheep the sum of Forty-five thousand three hundred forty and 50/100 ($45,340.50) Dollars, payable one year from the date hereof, bearing interest at the rate of eight (8) per cent. However, it is mutually agreed that all moneys received from the sale of wool, sheep or lambs, prior to the date of maturity of said purchase price, shall be divided and the one-half part of the receipts from such sources which would belong to the party of the second part shall be applied in pay-

ment of any advances made by the party of the first part to the party of the second part, the interest on the purchase price and upon the purchase price. Said receipts to be applied in the order herein mentioned.

"The party of the second part agrees to furnish one-half of the necessary expenses for the care of the said sheep and in the event of his inability to furnish one-half of the necessary expenses, the party of the first part agrees to make such advances and if necessary, to provide the party of the second part with the necessary living expenses. All of which sums are to be treated as advances and paid as herein mentioned.

"It is mutually agreed by the parties hereto that a settlement shall be made following the first of each and every month, and all advances and receipts from the sale of sheep and wool during the preceding month and the exact conditions existing between the parties determined as of the date of the said first of each and every month.

"It is mutually agreed that each of the parties are to contribute equally to the expenses of the care and maintenance, market and otherwise handling of the sheep hereinabove mentioned, except, however, that such expenses as are herein mentioned which under the terms of the various contracts hereinbefore mentioned between the party of the first part herein and the third parties are to be borne only in accordance with the terms, provisions and conditions of the contracts.

"It is further mutually agreed that the title to all of said sheep now owned by the party of the first part, or any sheep acquired by exchange, substitution or purchase shall be and remain in and the property of the party of the first part until such time as the purchase price hereinabove expressed, together . with the interest thereon and any advances made have been paid, satisfied and discharged.

"It is further mutually agreed that in the event of the death of either party hereto within one year of the date hereof, that the sheep now owned by the party of the first part, and the subject matter of this contract, shall be sold and one-half of the

sale price so received to be paid to the party of the first part and so much of the other one-half of the same price so received as is necessary to pay the purchase price here expressed, interest thereon and advances paid to the party of the first part, or his executors, administrators or assigns and the balance paid to the party of the second part, his executors, administrators or assigns.

"It is further mutually agreed that it is the intention of the parties hereto that in the event the handling of the sheep during the year commencing November 1, 1930, and ending November 1, 1931, is mutually satisfactory to the parties hereto to continue a like arrangement for one further year, provided, however, that this provision shall not be an option on the part of either party, but in order to make the contract operative for another year it must be mutually agreed upon by the parties hereto.

"It is further mutually agreed that any sheep which may be received by trade or exchange for any sheep, the subject matter of this contract, shall be held subject to the provisions herein.

"It is further mutually agreed that neither party to this contract shall sell or assign his interest therein without the consent of the other party first had and obtained in writing.

"In Witness Whereof, the parties have hereunto set their hands and seals on the day and year herein first above written.

" (Acknowledgment.)

"E. W. CARMICHAEL    [Seal.]
"RAY SNIDER    [Seal.]"

"Exhibit B.

"Agreement.

"This agreement, made and entered into in duplicate this 1st day of April, A. D. 1933, by and between E. W. Carmichael, of Lewistown, Montana, the party of the first part, and Ray Snider, of Lewistown, Montana, the party of the second part, Witnesseth:

"That party of the first part hereby agrees to sell and transfer, to the party of the second part, and the party of the second part agrees to buy from the party of the first part, an undivided one-half interest in Sixteen Thousand (16,000) sheep, ranging in ages from one to five years respectively, including Three Hundred (300) rams, for the sum of 43,000 Forty Three Thousand Dollars, and which said sheep are now on the range is the counties of Garfield and Fergus, Montana, and all of which said sheep are branded with black cross on back, and together with increase during the life of this contract, shall be at all times so branded.

"It is mutually covenanted and agreed by and between the parties hereto that each of the parties hereto shall contribute equally to the care, maintenance, grazing, running, handling, shearing and marketing of said sheep, and any and all other expenses incident to running and handling said sheep, and in the event that party of the second part is unable to advance his portion of the expenses incident to running and handling said sheep, then party of the first part will advance such money as may be required for expenses, with the portion thereof chargeable to second party to be repaid to first party out of the sale of wool and lambs; and it is further expressly agreed that party of the second part shall not acquire an interest in any other sheep or become interested in or own any other sheep except by and with the consent of the party of the first part first obtained in writing.

"It is further covenanted and agreed by and between the parties hereto that Five Thousand (5,000) head of the said sheep are subject to two certain mortgages formerly obtained upon same, one by Herschel Carmichael, of Delphia, Montana, mortgage securing a note in the amount of Six Thousand Five Hundred Dollars ($6,500.00) and the other securing a note in the amount of Ten Thousand Dollars ($10,000.00) given to Ray Snider, the party of the second part herein, each of said chattel mortgages running to the Regional Agricultural Credit Corporation of Spokane, Washington; and it is expressly un-

derstood and agreed that the said mortgages and each of them are assumed by the respective parties hereto, and that they shall be paid out of the sale of lambs and wool produced from the sheep which are the subject of the agreement, or from the sale of such portion of said herd as may be necessary, it being further understood and agreed that the said sheep so mortgaged and included herein were embraced in other contracts entered into respectively between the party of the first part and Herschel Carmichael, and the party of the first part and the party of the second part herein, in which said contracts the party of the first part retained title to all of said sheep until the purchase price thereof had been paid, but that each of said mortgages were made by and with the consent of the party of the first part herein, and it is expressly agreed that no part of said mortgage indebtedness assumed by the respective parties hereto shall be deducted from the purchase price to be paid by second party for one-half interest in said sheep. With interest at the rate of % 8 per cent until paid.

"It is further covenanted and agreed that each of the parties hereto shall keep an accurate account of any and all moneys whatsoever expended in connection with running and caring for said sheep, carefully itemizing same, and likewise keep an accurate account of any and all receipts from the sale of lambs, sheep or wool, and that a statement or account shall be rendered on or before the 5th of each month monthly by each of the parties hereto, in which all expenses and receipts have been itemized for the preceding month, to the end that accurate accounts be kept at all times.

"It is further agreed that this contract shall be and remain in full force and effect to and including November 1, 1933, and for such longer period of time as may be agreeable to the parties hereto, provided, however, that in the event of the death of either party hereto within three months from the date hereof, that the said sheep now owned by the party of the first part and the subject matter of this contract shall be sold, and after a full and complete settlement, including the payment of obligations and the portion of the purchase price, unpaid, such

balance as may remain from the sale of one-half of said sheep shall be paid to the party of the second part, his heirs or assigns.

"It is further covenanted and agreed by and between the parties hereto that any and all former contracts and agreements relating to sheep between the parties hereto are fully and completely adjusted and settled, as well as previous accounts between the parties hereto, and merged in this agreement; and it is further agreed that all title to said sheep shall be and remain in the party of the first part until the party of the second part has paid the full purchase price for one-half of the sheep, together with their increase described herein, together with his full share of any and all expenses incurred in running, handling and caring for said sheep.

"It is further agreed that the party of the second part shall at all times devote his time and best efforts to caring for, looking after, and handling said sheep.

"It is expressly understood and agreed by and between the parties hereto that the covenants and agreements hereof shall apply to and bind the heirs, executors, administrators, and assigns of the respective parties hereto, and it is further expressly agreed that this contract shall not be assigned, nor any portion of said sheep sublet, nor shall party of the second part suffer any interest he may have in said sheep to be encumbered in any wise except by and with the consent of the party of the first part first obtained in writing.

"In Witness Whereof, the parties hereto have hereunto set their hands in duplicate copies hereof on the day and year first above written.

"RAY SNIDER

"E. W. CARMICHAEL.

"Signed in the presence of

"BESSIE CARMICHAEL."

In March, 1934, the plaintiff was advised by third parties that the defendant had made derogatory remarks to some of the employees of the joint adventure about the plaintiff, which plaintiff believed tended to destroy his efficient handling of the

business, and one statement was to the effect that defendant intended to "get rid" of plaintiff. March 31, 1934, plaintiff and defendant had a conversation on the streets of Lewistown, and plaintiff told defendant of the derogatory statements he had heard that defendant said about him, and added that they had just as well quit. Defendant denied having made any such statements, but said to plaintiff that if he, plaintiff, believed such statements he would not blame him for quitting. Plaintiff told defendant he believed what he had heard, and on April 3, 1934, plaintiff gave defendant written notice as follows:

"Lewistown, Montana, April 3, 1934.

"Mr. E. W. Carmichael,

"Lewistown, Montana.

"Dear Sir: Please take notice hereby that I desire to terminate the agreement entered into between us July 29, 1933, and signed as of April 1, 1933, and that I hereby ask for an accounting of the business between us arising under the said agreement.

"Yours very truly,

"RAY SNIDER."

Plaintiff and defendant then endeavored to adjust their accounts and affairs looking to a termination of their venture, and had agreed in all matters, except they could come to no agreement as to the value of the sheep. Plaintiff proposed that each choose a man and the two chosen to select a third, and have the three so chosen fix a price on the sheep. Defendant first refused to take such action, but later said to go ahead, and remarked, "We will see where we get at." The three persons were chosen, and after some two days' conference amongst themselves and the parties hereto, the three respectively fixed the price of the sheep at $6.25, $6.50, and $8.33 per head, without distinction to age or sex, but could not agree on a price approved by all.

It had been the practice for defendant to have funds placed to the credit of the plaintiff at the bank as the same were required by plaintiff to meet operating expenses for the business

and for plaintiff's personal use. After notice of intention to terminate the joint handling of the business, plaintiff continued to attend to his usual duties in handling the sheep until on or about April 13, 1934, at which time defendant stopped payment of plaintiff's checks on the bank account. Upon the failure of the plaintiff and defendant to come to a satisfactory adjustment of their affairs either by themselves or with the aid of the three parties called in, and after defendant stopped payment on the checks drawn by plaintiff against the bank account, plaintiff appears to have concluded that his interest in the sheep and other property was in jeopardy, and filed his complaint herein. Copies of the two contracts were attached to the complaint as exhibits.

The complaint outlines the facts leading up to the first contract, alleged the circumstances that led plaintiff to give notice of termination, the inability of the parties to arrive at a satisfactory adjustment of their affairs, the ownership of approximately 18,500 head of sheep of the value of $170,000 on April 3, 1934, and other personal property consisting of horses, camp equipment, and leases of the approximate value of $5,000; that the reasonable value of the plaintiff's gross interest in the property was $87,500, and prayed that the contracts relating to the enterprise be terminated; that the defendant be required to account to the plaintiff for all items of debit, and credit and all of the property of the joint adventure; that a balance be struck between the plaintiff and defendant, and the amount which the plaintiff agreed to pay to defendant as a part of the capital of the adventure be paid to defendant out of the proceeds of plaintiff's one-half of the property, or that an equitable division of the property be made by the court, and the plaintiff be decreed to be the owner of the portion of the property decreed to him. Second, that if an equitable division of the property after the payment of the amounts above mentioned could not be made, all of the property be sold under decree of the court and the proceeds thereof applied and paid as provided in the contract. An application for the appointment of a receiver pending the adjustment of the controversy was later

abandoned. The plaintiff prays for costs and for such other relief as the court may deem equitable and proper.

Defendant's motion to strike practically all the material allegations of the complaint was denied, except as to certain portions of paragraphs 7 and 13. The record is not clear as to the portions stricken. Defendant's demurrer was also overruled.

The answer alleges that the contract of November 1, 1930, was terminated and had nothing more to do with the enterprise; that the contract of April 1, 1933, signed July 29, 1933, was the sole and only contract in existence at the time plaintiff gave notice of his withdrawal from the enterprise; it admits that there were approximately 18,500 sheep of the value of $140,000 on hand April 3, 1934, when the plaintiff gave notice of the termination of the agreement. By amendment during the hearing, this value was reduced to $110,000. Defendant alleges that at the time of entering into the contract marked Exhibit B, dated April 1, 1933, the plaintiff and defendant had an accounting, and that at that time it was ascertained and determined that plaintiff owed the defendant the sum of $43,000, with interest from date at the rate of 8 per cent. per annum. Defendant further alleges, in substance, that plaintiff voluntarily withdrew from the project as set forth in the agreement, Exhibit B, and refused longer to be bound thereby; that title being specifically reserved in defendant, plaintiff, after withdrawing, had no further right, or interest, or equity in or to any of the assets of the enterprise.

The reply specifically denies and puts in issue all the above allegations of the answer, and further alleges that plaintiff complied with all the provisions of the agreement between the parties, except as to payment of the amount which plaintiff agreed to pay defendant for the half interest in the sheep.

The matter came on for trial on February 5, 1934, before the court sitting without a jury. Testimony was offered and received on behalf of the parties, briefs were submitted, the cause was taken under advisement by the court, and thereafter

the court made its findings of fact and conclusions of law, and entered its decree on July 1, 1935, as follows:

"That prior to the 1st day of April, 1934, the plaintiff and defendant were jointly running certain bands of sheep according to the terms of a written contract bearing date April 1, 1933, which written contract continued an arrangement for the running of said sheep under a contract dated November 1, 1930.

"2. That under the terms of said contract each party had the right to discontinue the business of jointly running said sheep after the 1st day of November, 1933.

"3. That on or about the 1st day of April, 1934, the plaintiff elected to discontinue his part in the joint running of said sheep, and thereafter an accounting was rendered between said parties for the final winding up of said business between plaintiff and defendant.

"4. That upon the said 1st day of April, 1934, there were in the several bands of sheep of the parties hereto 17,842 ewes, including yearling, 364 bucks, in addition to some miscellaneous personal property used in the joint business, and also some leaseholds paid for by the joint assets of said parties. That a schedule of the assets and the values thereof is as follows:

| | |
|---|---:|
| 17,842 ewes and yearlings at $6.50 per head | $116,173.00 |
| 364 bucks at $10.00 per head | 3,640.00 |
| Miscellaneous personal property as follows: | |
| Seven saddle-horses at $30.00 per head | 210.00 |
| Seven wagons at $75.00 | 525.00 |
| Two wagons at $125.00 | 250.00 |
| Four harnesses at $25.00 | 100.00 |
| Eight saddles at $15.00 | 120.00 |
| Twelve work horses at $85.00 a team | 510.00 |
| Lambing equipment | 1,000.00 |
| Leaseholds as follows: | |
| Ted Bergham | 100.00 |
| A. Hanson | 50.00 |
| Four and one-half Sections near Maginnis Creek | 187.50 |
| Total assets | $122,865.50 |

"5. That the title to all of the above-mentioned property stood in the name of the defendant.

"6. That the plaintiff owed certain obligations to the defendant which he agreed to pay, and for which obligations the defendant held the title to plaintiff's one-half interest in said property. That said obligations owing by the plaintiff are as follows:

Principal owing by plaintiff for his interest in the business ....................................$43,000.00
Interest on above principal to April 1, 1934.........$ 2,270.00
Obligation of plaintiff as agreed upon in March, 1934 ......................................$ 6,629.50
Other items agreed upon at the time of trial, totaling ........................................$ 2,370.52

"7. That the plaintiff is entitled to credits agreed upon at the time of trial amounting to $442.50.

"8. Leaving a net obligation of plaintiff in the sum of $8,557.52.

"9. That during the year 1933 the defendant borrowed at the bank for use in the said business and paid out interest in the sum of $1,200.00 one-half of which should be charged against the plaintiff $600.00.

"10. That the gross obligations of the plaintiff due the defendant amount to the sum of $54,427.52.

"11. That at the time plaintiff elected to sever his business relations with the defendant it was agreed by the parties that the defendant should continue to run the sheep business, and to retain full title to the property used in said business.

"12. That the plaintiff's one-half interest in the said property was of the value of $61,432.75.

"13. That upon said date the defendant became indebted to the plaintiff in said sum of $61,432.75, less said sum of $54,-427.52.

"14. That the net amount due the plaintiff upon the final settlement of the accounts between the parties is the sum of $7,005.23.

"From the foregoing Findings of Fact the court renders the following Conclusions of Law:

"That the plaintiff do have and recover judgment against the defendant herein for the sum of $7,005.23, in addition to interest thereon at the rate of six per cent. per annum for the 1st day of April, 1934, amounting to the sum of $560.41, together with costs of suit herein incurred. Let judgment be entered accordingly."

Judgment was duly entered in accordance therewith in the amount of $7,565.64, and the same was filed July 8, 1935. From this judgment defendant appeals. He assigns 14 specifications of error.

Upon a careful review of the arguments of the parties and the multitude of cases cited by each, it becomes clearly obvious that all of defendant's specifications of error, the citation of authorities and his arguments are predicated upon the theory, first, that the contract of November 1, 1930, was abrogated when the contract of April 1, 1933, was executed and the accounting had July 29, 1933, on the basis of the contract prepared the previous April; and, second, that title to the sheep being specifically reserved in defendant by the contract, the plaintiff had merely an option to buy and, that, when plaintiff voluntarily terminated the contract, he forfeited all his property rights in all the sheep and other property, except the 1933 lambs. We think the solution of these two questions will determine the controversy.

Before proceeding with the consideration of the vital issues just mentioned, we think it well to briefly consider the classification of the contract that the parties here operated under. Plaintiff contends that it is a "joint adventure"; defendant that it is an executory contract, or, as counsel said in his oral argument, "a mere option to buy."

33 C. J. 841 says: "A joint adventure as a legal concept is of comparative recent origin. It is purely a creature of our American courts. At common law an enterprise of a limited character, such as is now called a joint adventure, was regarded

in law as merely an informal kind of partnership, and the courts made no attempt to distinguish the one from the other. Such is still the law in England and in Canada, but in the United States the courts, about the middle of the last century, began to find it convenient to draw a distinction between them, and hence there is gradually building up a body of American law applicable to the relation of joint adventures which may or may not apply to the relation of partners. So far the divergence between the two relations is very slight; so slight in fact that it is generally asserted that they are governed by the same rules of law. This is true as regards substantial rights, especially those enforceable in courts of equity; but there is a very marked difference between the attitude of courts of law as respects the two relations, for whereas these courts will not assume to redress grievances between partners, they will lend their aid in controversies between joint adventurers, and will hear and determine actions wherein one of them sues his associate for breach of contract, or a share of the profits, or losses of the venture, or for contribution for advances made thereto, notwithstanding courts of equity will retain jurisdiction in these matters.''

Counsel for plaintiff cites numerous cases and presents an extended and able argument in their brief bearing upon the different phases of joint adventure; some thirty pages of 48 A'. L. R. in an annotation beginning at page 1055, are devoted to an exhaustive discussion of what constitutes a joint adventure, the particular rules applicable thereto, and other distinctive features. It is further treated in an annotation in 62 A. L. R. 13, where many more recent cases are cited. In view of the conclusions of the authorities cited, we are of the opinion that the enterprise carried on by the parties in the case at bar constitutes a joint adventure. Essential features of partnership are lacking. (*Flathead County State Bank* v. *Ingham*, 51 Mont. 438, 153 Pac. 1005.) While, however, classifying the agreement between the parties in the case at bar as a joint adventure, it still remains an agreement to be interpreted and

construed according to our laws and to which our statutes are particularly applicable, and we will therefore revert to the two vital questions upon which defendant impeaches the decision of the trial court in his assignment of errors and argument.

It must be kept in mind that the rules of law developed by ▮ the decisions of the courts obtain only in the absence of pertinent statutory provisions to the contrary. (*Vande Veegaete* v. *Vande Veegaete*, 75 Mont. 52, 55, 243 Pac. 1082.) If such rules conflict with statutory provisions, the rules, of course, must give way to the statutes.

Our statutory provisions relating to the construction of con-▮ tracts are carefully expounded in *State* v. *Rosman*, 84 Mont. 207, 217, 274 Pac. 850, where it is said: "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful. (Sec. 7527, Rev. Codes 1921.) The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other. (Sec. 7532, Id.) 'In the interpretation of this contract we must call to our aid certain elementary rules. The intention of the parties is to be pursued if possible. (Sec. 10520, Rev. Codes 1921.) This intention is to be gathered from the entire agreement, not from particular words or phrases or disjointed or particular parts of it. (*Stockton Savings & Loan Society* v. *Purvis*, 112 Cal. 236, 44 Pac. 561, 53 Am. St. Rep. 210.) "The subject-matter of the contract and the purposes of its execution are material to the ascertainment of the intention of the parties and the meaning of the terms used, and when they are ascertained they must prevail." (6 R. C. L., sec. 226, p. 836.) It must be so interpreted as to give effect to the intention of the parties at the time of contracting. (*Ferry & Co.* v. *Forquer*, 61 Mont. 336, 202 Pac. 193, 29 A. L. R. 642.) The contract must be viewed from beginning to end, and all its terms must pass in review; for one clause may modify, limit or illuminate the other. (6

R. C. L., sec. 227, p. 838.)' (*Lee* v. *Lee Gold Mining Co.,* 71 Mont. 592, 600, 230 Pac. 1091, 1093.)''

We think that particular emphasis should be placed upon section 7527, supra, the intention of the parties. We also think the following statutes are particularly applicable to the contracts involved here:

''When a statute or instrument is equally susceptible of two interpretations, one in favor of natural right, and the other against it, the former is to be adopted.'' (Sec. 10527, Rev. Codes 1921.)

''When the terms of an agreement have been intended in a different sense by different parties to it, that sense is to prevail against either party in which he supposed the other understood it, and when different constructions of a provision are otherwise equally proper, that is to be taken which is most favorable to the party in whose favor the provision was made.'' (Sec. 10525, Id.)

The important question here is, Did the parties intend to wipe out all the property interest of the plaintiff that he had acquired under the contract of November 1, 1930, by the execution of the contract of April 1, 1933? We think the acts of the parties while operating under the contract of November 1 are plainly in conflict with the contentions of the defendant on this point. Defendant contends that the contracts are plain and unambiguous, and that extrinsic evidence may not be admitted to vary the terms thereof, but to this we do not agree. The irreconcilable theories of the able counsel for the parties as to the meaning of the contracts is some evidence that the contract or contracts are not clear, and there are provisions in both contracts that cannot be harmonized with the theory and construction of the defendant. Where contracts contain terms or expressions of doubtful import, proof of the mutual intentions of the parties may be resorted to. (*Lehrkind* v. *McDonnell,* 51 Mont. 343, 153 Pac. 1012.) Such intentions are shown here by the acts of the parties evidencing the construction placed upon the contract by the contracting parties. Such evidence was received over

the objection of the defendant, but we think properly admitted under the rule reasserted in *Marias River Syndicate* v. *Big West Oil Co.*, 98 Mont. 254, 265, 38 Pac. (2d) 599, and cases there cited.

Supporting the construction placed upon the contracts by the trial court, we have (a) the harmonious acts of the parties; (b) when the contracts were terminated, they attempted to adjust their affairs and accounts and succeeded in all things except to agree upon the price of the sheep. During the negotiations there is nothing in the record to show that the defendant at any time contended that plaintiff was not entitled to an equal division of the property, subject, of course, to plaintiff's indebtedness to the defendant. (c) 200 old ewes and 15 bucks that were sold the previous year had not been paid for, and defendant, without objection, agreed to credit the plaintiff with one-half of the amount due on that account, which was admitted to be good; as these were old sheep, the logical assumption is that they were out of the original bands. (d) Plaintiff testified that when the parties were attempting to adjust their affairs after plaintiff had given the notice of termination of the agreement, defendant said he would either pay plaintiff for his interest or divide the property. Such testimony stands undenied in the record. (e) The first contract provides that in the event of the death of either party, the sale of the sheep *then owned by the defendant* should be sold, one-half of the proceeds paid to the defendant or his representatives, and the other half used to pay any existing obligations due from the plaintiff to the decedent, including the purchase price of the half interest, and the balance paid to plaintiff or his representatives. (f) Calling in the three parties to fix a price upon all of the sheep in the adjustment of the affairs of the parties. (g) The second contract contains a provision that, in the event of the death of either party, the "said sheep" shall be sold and distribution of the proceeds made in substantially the same manner as provided in the first contract. "Said sheep" could refer only to the 16,000 ewes and 300 bucks mentioned in para-

graph 2 of the second contract. It does not say the increase of the sheep shall be sold, but "said sheep." (h) The accounting and settlement referred to in the second contract obviously relate back to the monthly settlement provided for in the first contract but which the parties had neglected to make, and the adjustments made in the second were to obviate any question that might thereafter arise about such monthly settlements not having been made. The use of the word "merged" in the second contract does not harmonize with an intention to revoke the first, but rather to make the second supplementary to the first. We think such construction is clearly supported by the provisions of the contract when such provisions are read in conjunction with the acts of the parties indicating the interpretation they placed upon their agreements.

When the second contract was executed, plaintiff had paid the defendant for all advances made by the latter, had paid the 8 per cent. interest on the purchase price fixed for the sheep, from the date of the contract up to the time of the settlement, and $2,340.50 on the principal, and the number of sheep had been increased from 11,000 to 16,000. There is nothing in the contracts nor the record to indicate that plaintiff believed he was relinquishing his interest in the sheep. The logical application of defendant's theory of the contract is that the sheep were run jointly, and plaintiff became the owner of one-half the increase and nothing more, and by reason of the new contract being made, this equal division provision of the first contract ceased to operate, the plaintiff relinquished not only all claim to the original sheep but also to the increase of more than 5,000 head, and the defendant became the sole owner thereof. Sections 10525 and 10527, heretofore cited, effectively negative the application of any such theory here. To impute any such intention to the plaintiff under the second contract would be to assume that he was utterly incompetent to manage his own affairs and a fit subject for state supervision.

On the question of reservation in defendant of title to the sheep, the contract says: "It is further agreed that all title to

said sheep shall be and remain in the party of the first part until the party of the second part has paid the full purchase price for one-half the sheep." There is no question but that the title was reserved for the purpose of securing the defendant for the purchase price, and no other, and defendant admitted on cross-examination such to be the purpose. The division of the property in the event of the death of either party, heretofore mentioned, conclusively repels any other conclusion.

The argument of counsel on the generosity of defendant in furnishing the capital and money for operating expenses loses its weight when it is remembered that the defendant, at all times prior to and in the settlement decreed by the court, got his own with interest, and by the decree of the court not only does the defendant get the value of his original capital but 8 per cent. interest, and the same return on the advances made to plaintiff for personal expenses; his holdings of sheep have been increased from 11,000 to 18,500 and by the acquisition of other personal property of the value of more than $3,000. The cost of maintenance and running of the sheep was paid for by the defendant in the first instance, but the management was left largely to the plaintiff, and the mutual obligations to bear the expense of the operations were fully met by the defendant advancing the money which was repaid with interest. Such accommodations to the enterprise were nothing more than are supplied by bankers in every line of business endeavor, but the banker can demand no more than the return of the money advanced with the interest agreed upon. The defendant was the banker for the enterprise in addition to sharing in the profits. It is not usually considered an act of generosity to lend money when interest is collected on the amount let out. The "debacle" of 1934 has nothing to do with the controversy. Had the wool been contracted in 1934 when 30 cents per pound could have been obtained and the lambs sold at 6½ per pound, the going price, both parties would have been much more in pocket, but such facts are merely another illustration of the fallibility of human judgment and have no bearing here;

as the contract was terminated April 3, 1934, the value of the joint property at that time was the value to be determined.

Numerous other contentions are advanced by the parties in their briefs, but we do not deem further comment necessary.

We are of the opinion that the conclusions reached by the trial court and the decree entered do substantial justice to the parties, and the judgment is therefore affirmed.

ASSOCIATE JUSTICES MATTHEWS and STEWART concur.

MR. CHIEF JUSTICE SANDS, absent, and MR. JUSTICE ANDERSON, disqualified, take no part in the foregoing decision.

Rehearing denied June 29, 1936.