W. H. BRADBURY, Plaintiff and Appellant, *v.* I. NAGELHUS, also known as INGVALD NAGELHUS, BORGHILD NAGELHUS, et ux., et al., Defendants and Respondents.

No. 9532.

Submitted September 18, 1957. Decided December 6, 1957.

319 Pac. (2d) 503.

Messrs. Burns & Thomas, Chinook, for appellant.

Messrs. Hauge & Hauge, Havre, for respondents.

Mr. Harry L. Burns and Mr. Oscar C. Hauge argued orally.

MR. JUSTICE CASTLES:

This appeal arises out of a dispute between long-time neighboring ranchers who signed a writing, agreeing to become "equal pardners [sic] in the purchase" of adjoining grazing leases and ranch lands. Technically, what they undertook is the form of quasi-partnership activity called a joint adventure. *Inter se,* joint adventurers are obligated as trustees. The litigation which developed is brought on the theory of a constructive trust.

The parties began their venture by each contributing $1,000 to bind a $19,500 one-year purchase option covering the lands and leases. They optioned without water, planning to obtain that separately through litigation they proposed to finance in the sellers' names. They forfeited the option and the $2,000 total option payment, but they continued their joint activities even, in one respect at least, beyond the date the present suit was filed.

The option was forfeited approximately three months before the water litigation was heard and about twelve months before decree was subsequently entered denying water to the land.

Within about nine months thereafter, one party bought all the land and leases, *but* solely for himself. He paid $14,000 cash. This, of course, becomes a total purchase price of $16,000 as between these parties if the forfeited option down payment is considered. To disregard it, disregards good faith.

The ''pardner'' who purchased all for himself is the principal defendant and respondent. He argues that after the option was forfeited he was free to deal for himself alone because the other ''pardner'' later failed to raise his part of the money needed to complete the purchase price. This reasoning is somewhat inverse. But granting the assumption, the argument still ignores the irrevocable nature of a trust, the joint adventure proposed by the writing between the parties and their many actions, both before and after the option expired, in furtherance of their agreement, and the bargaining advantage arising to an optionee as ultimate buyer from the fact that although forfeited the $2,000 paid to bind the option had nevertheless reduced the balance of the price.

The other ''pardner'' insists that he has always been willing and able to pay his portion of the purchase money. He is the plaintiff and appellant. He testified he could have secured the funds he would have needed through a Federal Land Bank purchase money loan he had been assured he could obtain. The record clearly indicates that he was never given a final opportunity to join in payment of the reduced final purchase price after it was decided. His statements were denied by the defendant, but were not otherwise rebutted. Neither side called corroborating witnesses on the point.

The plaintiff was not sustained in the District Court. He now appeals praying that defendants be ordered to account to him as constructive trustees, and that an undivided one-half interest in the lands and leases be conveyed to him by them or by the court. He alleges he stands ready to pay whatever is his portion of the $14,000 purchase price as finally determined by the accounting.

The ''pardner'' who purchased all for himself took title

 jointly with his wife, and they in turn gave their son a deed to a portion of the property covered by the purchase. The wife and son are donees, are joined as defendants and are controlled by their donor's actions. R.C.M. 1947, section 86-313; Davidson v. Stagg, 94 Mont. 272, 279, 22 Pac. (2d) 152. Hereafter they are included with him under the single term respondent, the husband and father being called, when clarity requires, the principal respondent.

Except that the principal respondent purchased solely for himself and except that he has kept crop income from the property and all gas and oil rentals paid under a lease he negotiated with one of the major oil companies some eighteen months after he purchased all for himself, the actions both of respondent and of appellant have been throughout preponderantly those of quasi-partners engaged in a joint adventure and obligated *inter se* upon an involuntary trust. A summary of the pertinent testimony clearly shows this.

These men originally contributed equal amounts of capital to the venture. They optioned and they proposed to purchase in respondent's name and they also leased from the owners in respondent's name pending purchase, but the record shows that the option and the lease were intended for the benefit of both. They offered to deal jointly and they dealt jointly with third parties. They jointly leased out land as prospective joint purchasers. They mutually contributed labor and expenses, joined in financing the water litigation, jointly bought and used haying machinery, divided crops, shared soil conservation checks and periodically made settlements between themselves. Respondent paid all the purchase money and all taxes. Appellant paid some of the state grazing fees. They tacitly made a section-line division of some of the property they hoped to buy, still recognized between them even as late as the time their dispute was tried to the District Court. The record contains credible testimony, although disputed, that respondent refused tender by appellant of at least some part of appellant's portion of the purchase price ultimately paid, and, according to

appellant, once accepted interest from appellant on it. Discussing a joint adventure which similarly had ended in litigation, the late Justice Claude Morris, earlier a banker, wrote: "It is not usually considered an act of generosity to lend money when interest is collected on the amount let out." Snider v. Carmichael, 102 Mont. 387, 413, 58 Pac. (2d) 1004, 1013.

Respondent disputed all this. He also denied the testimony of appellant's wife that respondent admitted his buying all the leases and lands solely for himself "wasn't just right," and he disputed her testimony that respondent excused his action by saying the land "had come up in value and that he wanted to keep it."

However, respondent's own admissions show that he considered appellant "in on the deal" up to the time in October 1950 when, according to respondent, appellant refused to raise his half of the purchase money, although respondent insisted he did not consider appellant in on the deal thirty days thereafter when respondent bought all for himself. But to other questions he replied that if appellant "could have raised the money I would have shared the land with him."

Respondent's wife also denied that her husband had ever admitted any guilt of conscience, but when asked by respondent's own counsel if she, respondent's wife, had heard her husband tell appellant that he (respondent) had paid for the land and had decided to keep it for himself she answered, "Yes, sir."

The venture was undertaken on January 19, 1948. The one-year option is dated February 16, 1948, and was forfeited one year later. The water suit was filed during 1948 and heard in May of 1949. The decree denying water to the land was entered on February 28, 1950. Respondent testified that by the end of October, 1950, he had determined to go forward alone in the purchase after, so respondent insisted, appellant had told him he "could not raise the money." We have pointed out that nowhere is there testimony showing that respondent ever directly demanded, after the $14,000 price was decided, that

appellant either produce purchase money or withdraw from the venture. Minimum considerations of good faith so require. R.C.M. 1947, section 86-301 et seq.

As stated, respondent bought solely for himself in November 1950, taking title in his and his wife's names, and they immediately giving a portion of the land purchased to their son. The various deeds were recorded in February 1951. Respondent and his wife leased for oil and gas in May 1952, receiving first rental income of some $900 when the lease was signed. Respondent testified he told appellant in March of 1951 that he had deeds to all the lands, but denied there was other discussion. This is the record:

Question by appellant's counsel: "Did you have any conversation with him [appellant] about the deal, then? Did you tell him that he was out of it? A. We didn't have no conversation on the deal. I just told him I had it."

This testimony was elicited by appellant's counsel from respondent as an adverse witness at the opening of the trial. Respondent's counsel seeks to minimize it by pleading respondent's deficiency in the use of the English language. But we note that later respondent stated unequivocally that it was June of 1952 before he definitely informed appellant that he (respondent) "had paid for the land and was going to keep it." Whether this definite disclosure was deferred by coincidence or by design, pending execution of the oil and gas lease, is not made clear. Unexplained, the implications are most damaging to respondent.

On direct examination, appellant gave this version of the conversation occurring in October 1950 on which respondent testified he determined to purchase for himself alone, and which respondent now interprets as appellant's refusal to contribute appellant's portion of the final purchase price, although respondent insists he was free to purchase for himself from the time the option expired in February 1949: "[respondent] wanted to know the price he should offer * * * without the water rights, and I told him to offer * * * about fifteen or

sixteen thousand dollars. * * * I told him I didn't have the cash to pay for it, but I had been talking with * * * [a local agent] of the Federal Land Bank, to see if I could get a loan * * * and he said it would be alright. * * * [respondent] had plenty of cash to pay for it.''

Respondent's version, also given on direct examination, is as follows:

''Q. Did you ask * * * [appellant] if he was interested, or anything? A. He thought he was interested.

''Q. Well, what was the rest of the conversation? A. Well, I told him I was going to offer them $4,000 and then $10,000 when they gave us the deed. [Emphasis added.]

''Q. Well, did * * * [appellant] say anything? A. He said that you might not get it for $14,000—you might have to offer * * * $16,000.

''Q. Is that all the conversation? A. No. He said that he didn't have the money—he couldn't raise it. He said, 'I can't raise the money.' So I said 'Well, I will see * * * [the sellers] myself'.''

The foregoing substantially summarizes the testimony and the salient facts. The crux of the dispute is presented as the differing versions of the October 1950 conversation. However, except that respondent's version omits and appellant's version insists that appellant had assurance of a Federal Land Bank purchase loan, the two versions of the conversation essentially agree, and they are consistent with the entire record. As will be shown, no matter which version is the truth, other considerations control our decision.

Appellant filed this action in August 1952. The case was tried to the court, without a jury. The court's findings of fact and conclusions of law denied all relief to appellant.

Respondent now presents himself merely as a one-year [4] tionee, freed of the written agreement and privileged to deal for himself alone when the option expired. If this be true, then appellant's alleged failure to tender his portion of the purchase price becomes irrevelant. Appellant makes both

principal parties out to be joint adventurers, in good faith bound to each other as involuntary trustees. We so hold.

The appeal is based on twelve specifications of error. They raise two questions: (1) Does the agreement with the actions confirming it raise a constructive trust? (2) If so, did such trust end when the option expired, as respondent insists, or when, if respondent is to be believed, appellant refused to raise his portion of the final purchase price, or not at all? The answers to these two questions will meet all twelve specifications of-error.

Following is the writing between the parties. It makes the point they intended. The scrivener was no lawyer; he ignored all the saving exceptions.

"Havre, Montana
"Jan. 19, 1948

"To Whom It May Concern:

"Ingvald Nagelhus and W. H. Bradbury hereby agree that they are equal pardners [sic] in the purchase of the 3450 acres of deeded land, and the 1428 acres of leased land now comprising the land holdings owned by the Prescott Company, Amandus Sims and Irling Sims, subject to the conditions agreed upon between them as follows:

"Buildings, if sold, sale money to be divided equally between them. Otherwise all buildings to be divided equally.

"W. H. Bradbury has paid to Ingwell [sic] Nagelhus this day, Jan. 19, 1948 the sum of One Thousand Dollars ($1000.00) paid cash in hand, to bind the above.

"Witness by:

"/s/ I. Nagelhus
"/s/ W. H. Bradbury"

Even as the agreement was being signed, appellant received word that his ranch home was burning. From then on he appears to have been continually hard-pressed for cash. But he paid the $1,000 within some sixty days, out of his fire insurance money. Nothing in the transcript implies that respondent ever offered to return it.

426

Constructive trusts are raised, in equity and good conscience, ██ upon a trustee's obligation to do what ought to be done. Appellant and respondent called themselves "pardners in the purchase" of ranch lands and grazing leases but, as stated, their legal status is that of joint adventurers.

Broadly speaking, a joint adventure may be characterized as ██ a quasi-partnership in a single adventure undertaken for mutual gain. The terms joint adventure and joint venture are synonymous. 48 C.J.S. Joint Adventurers, section 1, page 803. If the venture be for pleasure rather than profit, it is sometimes called a joint enterprise.

These relations differ technically but assume one element common to all. *Inter se*, partners are agents and principals. Trustees are agents for their beneficiaries, but beneficiaries are not agents for their trustees. A court of equity will raise a constructive trust to sustain a joint adventure but not alone to enforce a copartnership. Joint adventures and joint enterprises are defined on principles applicable to partnerships. *Inter se,* partners and joint adventurers are obligated as trustees. The common element is the fiduciary relation.

Historically the legal concept of a joint adventure, as separate ██ from a copartnership, is American and of comparatively recent origin. Legal recognition of the partnership entity dates from the Law Merchant, but the partnership relation is as old as enterprises jointly undertaken by men. The bona fides assumed in all trusts reflects ideals of medieval chivalry. They are the essence of a constructive trust. In equity they are imperative. Here we deal with these bona fides. R.C.M. 1947, section 49-121 (Maxims of Jurisprudence); Rae v. Cameron, 1941, 112 Mont. 159, 114 Pac. (2d) 1060; 30 Am. Jur., Joint Adventures, sections 4 and 5, pages 678-679, section 34, page 695; 40 Am. Jur., Partnership, section 3, page 127, sections 17 and 18, pages 136-137; 68 C.J.S., Partnership, section 1(4), page 403, section 6, b, page 409; 48 C.J.S., Joint Adventures, section 1 a, page 801, section 1(6), page 806, section 5, b and c, pages 822, 823; Annot., 138 A.L.R. 968; Annot. 63 A.L.R. 909;

Annot. 48 A.L.R. 1055; 4 Pomeroy, Equity Jurisprudence, section 1044, page 93, section 1053, page 119 (5th ed.); II Scott, Trusts, section 170, page 1193 (2d ed.); Pacific Atlantic Wine, Inc. v. Duccini, 111 Cal. App. (2d) 957, 245 Pac. (2d) 622, 626-627; Whitsell v. Porter, 309 Ky. 247, 217 S.W. (2d) 311.

"* * * a constructive trust is not based on the intention of the parties but is imposed by the court in the interests of justice, to redress a wrong or to prevent unjust enrichments." I Scott, Trusts, section 2.1, page 35 (2d. ed.).

"One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he has some other or better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." R.C.M. 1947, section 86-210.

Counsel for both appellant and respondent concur in assuming that our decision on appeal must depend on whether we believe appellant's testimony that he was willing and able to pay his portion of the $14,000 purchase price or believe respondent's testimony that appellant refused. This does not necessarily follow. The outcome is controlled by the law of involuntary trusts, as applied to the testimony evidencing actions of both parties, about which there is no dispute.

This being an action in equity, it is controlled by R.C.M. 1947, section 93-216, which reads in part:

"In equity cases * * * the supreme court shall review all questions of fact arising upon the evidence presented in the record * * * and determine the same, as well as questions of law, unless, for good cause, a new trial or the taking of further evidence in the court below be ordered * * *."

Appeals in equity require a disposal by this court which will ▮ "put an end to litigation and avoid the necessity of new trials involving expense and the contingencies incident to delay." State ex rel. United States Fidelity & Guaranty Co., etc. v. District Court, 77 Mont. 594, 600, 251 Pac. 1061, 1062; Bond v. Birk, 126 Mont. 250, 247 Pac. (2d) 199 (rehearing denied).

On repeated reading, absent the pressure under which all trial

428

courts must labor, the record raises a constructive trust by unmistakable, clear, satisfactory and convincing testimony. To warrant reversal of a trial court's findings and conclusions in an equity appeal, the record must be such. Eisenberg v. Goldsmith, 42 Mont. 563, 575, 113 Pac. 1127. This rule was announced in 1899 by Chief Justice Brantly in Guignon v. First National Bank, 22 Mont. 140, 146, 55 Pac. 1051, 1097, on the authority of Pomeroy's Equity Jurisprudence, section 1058, now IV Pomeroy, Equity Jurisprudence, section 1058a, page 145 (5th ed.). See also Mather v. Musselman, 79 Mont. 566, 580, 257 Pac. 427.

If the parties were, as respondent contends, one-year optionees, then unquestionably any trust obligation of bona fides between them ended with the option. But by their writing, by their actions and by respondent's own admissions, an involuntary trust was raised. Once there is acceptance, actual or presumed, a trust may be revoked only by agreement or by the courts. R.C.M. 1947, sections 86-602, 86-605.

"A fiduciary, however, cannot simply by terminating the relationship put himself in a position to acquire the property for himself which otherwise he would be under a duty to hold for his principal." IV Scott, Trusts, section 499, page 3227 (2d. ed.).

Trusts are extinguished only by illegality, impossibility or fulfillment. R.C.M. 1947, section 86-601. Neither malfeasance nor wrongful conversion will lapse or terminate a trust nor discharge the trustee. R.C.M. 1947, section 86-604; 54 Am. Jur., Trusts, section 83, page 82; Girard v. City of Philadelphia, 7 Wall. 1, 74 U.S. 1, 19 L. Ed. 53; Noble v. Noble, 198 Cal. 129, 243 Pac. 439, 43 A.L.R. 1235. Unless discharged, a trustee is in office till he dies. R.C.M. 1947, section 86-603.

Trusts ex maleficio are never express and never intended by the constructive trustee. They are impressed by the courts because the principles applicable to express trustees likewise apply to other fiduciaries. These include partners and joint adventurers. "Each of these owes a duty of loyalty to the per-

sons to whom he is in a fiduciary relation, and if in violation of his duty of loyalty to them he seeks to acquire or retain for himself some property interest, he is chargeable as constructive trustee for them." IV Scott, Trusts, section 495, page 3216 (2d. ed.).

Scott gives the rule applicable to respondent's actions, with many citations, as follows: "Thus it has been held in numerous cases that where two or more persons orally agree to enter into a partnership or joint adventure in acquiring a piece of land and dealing with it for their joint profit, and one of them undertakes to purchase the land for himself * * * he is chargeable as constructive trustee." IV Scott, Trusts, section 499, page 3223 (2d ed.).

The rule is also phrased: "Where a person in a fiduciary relation to another acquires property, and the acquisition or retention of the property is in violation of his duty as fiduciary, he holds it upon a constructive trust for the other." Restatement, Restitution, section 190, page 780.

Pomeroy cites both Scott and the Restatement of Restitution to support the rule: "Equity regards such a purchase as made in trust for the person beneficially interested, *independently of any imputation of fraud, and without requiring any proof of intention to violate the existing fiduciary obligation,* because it assumes that the purchaser intended to act in pursuance of his fiduciary duty, and not in violation of it." Emphasis added. 4 Pomeroy, Equity Jurisprudence, section 1049, pages 105-106 (5th ed.). Pomeroy's supporting citations include: Wilson v. Wilson, 64 Mont. 533, 210 Pac. 896.

See, also, 30 Am. Jur., Joint Adventures, section 15, page 684, to the effect that "The relation between the parties to a contract under which they are to join in the purchase of land, each to pay an equal share, or a proportionate share, of the purchase price, and afterward to sell the land and share the profits equally, or in proportion to their interest therein, is that of joint adventurers, with obligations of fidelity, fair dealing, and truthfulness between them, as in the case of a partnership

proper, although not strictly a partnership. Stated in another way, an agreement to combine money, effort, skill, and knowledge, and to purchase land for the purpose of reselling or dealing with it at a profit, is a partnership agreement, or a joint adventure, having in general the legal incidents of a partnership.'' Likewise see 48 C.J.S., Joint Adventures, section 7(1), page 831.

By quotation, citation, or reference this court has many times reiterated these principles. As supplementing Montana decisions thus far cited see, among others, Snider v. Carmichael, 102 Mont. 387, 58 Pac. (2d) 1004; Campanello v. Mercer, 124 Mont. 528, 227 Pac. (2d) 312; In re McAnelly's Estate, 127 Mont. 158, 258 Pac. (2d) 741. The decisions are a continuing commentary on the maxim of jurisprudence that one must not change his purpose to the injury of another. R.C.M. 1947, section 49-104.

From the foregoing it is obvious that the answers to the two questions raised by appellant's specifications of error are, first, that under all authorities applicable to the undisputed facts, a constructive trust is raised against respondent and, second, that respondent may not revoke it. He must convey an undivided one-half interest in the lands and leases to appellant.

Conveyance, however, is subject to down-to-date accounting first had between the parties, and appellant must reimburse respondent in the net amount of the purchase price found to be due from appellant to respondent after accounting is complete from date of original agreement, R.C.M. 1947, section 86-310; 4 Pomeroy, Equity Jurisprudence, section 1058, page 143; IV Scott, Trusts, section 499, pages 3219, 3220, 3224.

But pending completion of accounting and to assure respondent of appellant's willingness and present ability to perform, appellant is hereby ordered to deposit, within sixty days after issuance of remittitur, in the district court, good and sufficient performance bond in a penal sum not to exceed $7,000, which sum is indicated by the testimony as appellant's maximum portion of the final purchase price, and in form satisfactory to

the district court. Whereupon, let accounting proceed, net purchase price be paid over by appellant to respondent, and conveyance be made thereafter. Otherwise, let judgment stand as now rendered in the district court.

The cause is remanded for proceedings to be had consistent with the ruling of this opinion.

MR. CHIEF JUSTICE HARRISON and MR. JUSTICES BOTTOMLY, ANGSTMAN, and ADAIR, concur.