STATE OF MONTANA on the relation of LARRY C. IVERSON, INC., a corporation, JOHN C. TREADAWAY and J. MILTON KRULL, Relators, *v.* The DISTRICT COURT OF THE NINTH JUDICIAL DISTRICT of the State of Montana, in and for the COUNTY OF PONDERA, and the HONORABLE R. D. McPHILLIPS, Judge thereof, Respondents.

No. 11013.

Submitted September 8, 1965. Decided October 25, 1965.

406 P.2d 828.

M. Dean Jellison (argued), Kalispell, Michael A. Bosco, Jr. (argued), Phoenix, Ariz., Donald A. Garrity (argued), Helena, for appellant.

Swanberg, Koby & Strope, Great Falls, Randall Swanberg (argued), Great Falls, Philip Strope (argued), Great Falls, for respondent.

LaVern V. Harris, Helena, argued amicus curiae.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an original proceeding. On September 15, 1965, we issued an Order setting aside an Order appointing a receiver and directing an immediate accounting with this opinion to follow.

Relator, Larry C. Iverson, Inc., is a Montana corporation engaged in farming in Pondera County. Relators, Treadaway and Krull, are associates in a management firm employed by Relator corporation and the shareholders thereof, to manage their affairs. This proceeding is for a Writ of Prohibition or other appropriate writ against the District Court and the Judge thereof to vacate and annul an order and judgment of August 23, 1965, and to stay all proceedings in that action.

On August 5, 1965, Relators were served with a summons, complaint and order to show cause in the case of Farmers State Bank of Conrad v. Carl O. Iverson, et al. In response thereto, Relators appeared before the Ninth Judicial District Court of Pondera County on August 16th and objected to the jurisdiction of that court to appoint a receiver of the property of Larry C. Iverson, Inc.

Notwithstanding the objections, the Court did appoint a receiver of the property of Larry C. Iverson, Inc., on August 23, 1965, after making findings of fact and conclusions of law. The findings and conclusions are as follows:

"That Larry C. Iverson, Inc., is a Montana Corporation with approximately eight stockholders and 2,523 shares of stock outstanding; that plaintiff is a pledge holder of certain shares of stock, legal title to which said shares remains in the stockholders thereof; that Larry C. Iverson, Inc., has been sued in Pondera County Civil Actions 7761 and 7762, wherein, among other things, plaintiffs therein have asked to set aside certain conveyances of real property now standing of record in the name of Larry C. Iverson, Inc.; that Larry C. Iverson, Inc., in Pondera County Civil Action No. 7711 has had property, standing in the name of said Larry C. Iverson, Inc., attached; that said above referred civil actions pending in Pondera County, Montana, are for substantial amounts of money; that Larry C. Iverson, Inc., mortgaged the 1965 grain crop of said corporation to J. Milton Krull and John C. Treadaway in the amount of $125,000.00; that said mortgage is dated approximately two months after the creation of the said corporation; and that the stock above referred and pledged to the plaintiff herein may be rendered virtually valueless in the event that all conveyances of land and other assets heretofore conveyed to Larry C. Iverson, Inc., be set aside, and more particularly so in the event the 1965 grain crop now ready to harvest on lands owned by Larry C. Iverson, Inc., be sold or dissipated."

The conclusions of law were as follows: "That plaintiff is

entitled to have a receiver appointed for Larry C. Iverson, Inc., not so the receiver may pay the indebtednesses alleged in plaintiff's complaint, but so that the value and integrity of the stock pledged as security to the plaintiff may be protected; that the receiver should put up a bond to be approved by the Court in the amount of $190,000.00; and that the receiver shall have the all necessary powers to carry on the business generally engaged in by Larry C. Iverson, Inc."

The Petition for a Writ of Prohibition alleged that the appointment of a receiver was completely unnecessary since the value of the Relator Corporation was in excess of $750,000, that the stock certificates pledged by the individual defendants as security for the debt owing by the individuals is more than adequate to satisfy any judgment. Also it was alleged that in an action for debt, such as this, there is no authority for appointment of a receiver, also, certain facts concerned with other lawsuits, condition of crop and harvest and other matters were alleged.

We issued an alternative writ and order to show cause, returnable September 8, 1965. On the return day the District Judge appeared by a Motion to Quash and a Return and Answer. Additionally, a transcript of proceedings had in the District Court and the original court files were introduced.

The Motion to Quash is on the grounds that an adequate remedy at law exists and therefore an extraordinary writ does not lie. The adequate remedy asserted is that of appeal under R.C.M.1947, § 93-8003, and 93-8004. Additionally, it is asserted that Relators Krull and Treadaway are holders of a note and chattel (crop) mortgage, such note not being due until November 30, 1965, and that such note and mortgage are under attack in the lower court action. Thus, reasons the respondent court, if premature payment of the note and mortgage in the amount of $125,000 were made to Krull and Treadaway, the validity of such obligation of the Corporation would be rendered moot to the injustice of the plaintiff Bank.

As remarked before, a transcript of a hearing had on the appointment of a receiver is before us. From it, and oral presentation at argument, the following background summary is made.

The Relator, Larry C. Iverson, Inc., is a farming Corporation held by eight stockholders. Of the eight stockholders, five, representing 1,663 shares of stock pledged their stock to the Farmers State Bank of Conrad to secure *personal* loans. This pledged stock is a majority of the stock. The pledges were sought and obtained by the Bank in late 1963 and early 1964 as security when it became uneasy over several loans represented by demand notes.

The five stockholders, who had pledged their stock, had become in varying degrees, financially involved in Colorado and Arizona and became defendants in a number of lawsuits. Lawsuits were filed in Montana against the stockholders individually and against Larry C. Iverson, Inc. The nature of the lawsuits is not completely clear; but they sought to "pierce the corporate veil" in an effort to get at the farmland and crop assets of Larry C. Iverson, Inc. This year is a "bumper crop" year and a valuable $190,000 crop is in the harvest.

The Bank, alleging personal unpaid debts, sued for their collection, suing to foreclose the pledges on the stock and praying that the stock be sold at public auction to satisfy the indebtedness represented by the notes and pledges, of *individual indebtedness* and not that of the Corporation.

Then, it was alleged in the suit that since the pledges represent a majority of the Company ownership, and since harvest time is imminent, and since a chattel mortgage on the crop, due November 13, 1965, for $125,000 is present although invalid as to the Bank, that this combination of factors materially affects the security of the Bank. Thus, it is alleged that a receiver is necessary to supervise the harvest and conserve the assets.

Nowhere is it alleged that Larry C. Iverson, Inc., or any of the defendants were or are *insolvent*. The entire sweep of the plea for receivership is to maintain the Bank's security, even though it already has the pledged stock and is foreclosing, and even though a value of $750,000 worth of land and a $190,000 crop is shown to exist.

An Order to Show Cause why a receiver should not be appointed was issued. It was directed to the five stockholders previously mentioned *and* to Relators, Larry C. Iverson, Inc., and Relators Krull and Treadaway. On the return, various appearances, special and otherwise, contesting the jurisdiction of the Court were made, but we deem this matter unimportant to our ruling herein.

At any rate, objections were made and overruled. A hearing was had at which it developed as previously described in part. The District Court appointed a receiver with a bond of $190,-000 required.

On the hearing aforementioned, the Corporation's status and needs were shown. The individual stockholders who had pledged their stock to the Bank are defending numerous lawsuits, both in Montana and in Colorado and Arizona. The Corporation likewise is defending. Krull and Treadaway were hired as business managers and are actively engaged in managing Larry C. Iverson, Inc., as well as the affairs of individual stockholders. It was shown that they had individually advanced at least their own credit for the benefit of the Corporation. It is true that they hold the aforementioned chattel mortgage on the current crop which is contested as to its validity. But their good faith appears from a meeting with the Bank directors on July 5, 1965, when the President of the Bank testified as follows:

"Q. Did you have, subsequent to July 5, 1965, any conversation with any of the persons involved in this suit relative to payment of those notes? A. Yes, sir.

"Q. Do you recall the approximate date? A. July 5th, 1965.

"Q. And on that date who did you talk to? A. I talked to J. Milton Krull and John Treadaway.

"Q. Was Larry Iverson also present? A. Larry was there for part of the conversation.

"Q. Was Mr. Swanberg also present? A. Yes, Mr. Swanberg was present.

"Q. Anybody else present? A. Yes, the other directors of our bank.

"Q. How many other directors are there? A. Two.

"Q. Is it correct that during the course of your conversation at that time a substantial agreement—verbal agreement—was reached for a method of payment of these obligations? A. There was a verbal agreement discussed, yes.

"Q. And at the time that meeting closed was it your understanding that an agreement had been reached? A. Yes.

"Q. Did that agreement generally call for extinguishing these obligations over a 3-year period in annual installments of roughly $40,000 each? A. Yes, sir.

"Q. And did you understand during the course of that discussion there are substantial outstanding obligations for current operations of the corporation? A. Yes, sir.

"Q. And those were going to have to be paid in order for the corporation to continue in business? A. Yes, sir.

"Q. Was it also understood in the course of the discussion that these payments that were to be made to your bank to extinguish those obligations would be given priority over any claims Mr. Treadaway or Krull would have? A. Yes, sir.

"Q. Was it also understood during the course of that discussion that new notes would be issued and a whole new set of paper would be created for the purpose of accurately reflecting this new obligation and the method of handling it? A. The notes were to remain as they were.

"Q. The same notes were to be held as existing on July 5th? A. Yes.

"Q. This related then solely to a method of payment of those

notes as distinguished from the new obligation? A. Yes.

"Q. Is it correct that an agreement incorporating the provisions of that discussion and the verbal agreement was prepared on behalf of your bank? A. Yes, sir.

"Q. Was that agreement forwarded among other people to Mr. Treadaway and Mr. Krull in Phoenix? A. Yes.

"Q. Do you recall a telephone call from Mr. Krull after that agreement was forwarded to him in which he indicated that the agreement did not reflect the agreement reached verbally between those people and yourself? A. Yes, sir.

"Q. And did you agree with him in fact that that agreement did not reflect the agreement which you made? A. Certain parts, yes.

"Q. Was an agreement prepared by Mr. Krull thereafter and forwarded to your bank which was an effort on his part to accurately reflect the agreement that had been reached? A. Yes, sir.

"Q. And did your bank in fact execute that agreement? A. No, sir.

"Q. Can you tell me why? A. I took the agreement immediately to our counsel, Mr. Swanberg, and was advised not to execute it.

"Q. At the time that you employed Mr. Swanberg in this case did you know he had in the past represented Carl Iverson and Mabel Iverson and Larry C. Iverson? A. Yes, sir.

"Q. And had he also in the past represented the Keierlebers? A. I understand that he did.

"Q. Did you feel that your bank would gain any advantage as regarding these defendants by retaining counsel who had represented them before? A. We felt that this man had done a lot of research and had a great deal of background material available.

"Q. Information he had gained while representing them? A. No, sir.

"Q. Well, how had he reached this information? A. How had he reached this information?

"Q. Yes, how had he? A. Well, he had done work on this case.

"Q. He had not done this work in this case previously for you? A. No, not for us. No.

"Q. The only persons he represented in these transactions were Carl and Mabel Iverson and Larry Iverson, Inc.? A. And Gilbert Keierleber, yes."

From the above testimony it appears that Krull and Treadaway were doing everything they could to protect the Bank interests, but were rejected. The Bank made an election of sorts and filed their suit to foreclose without further ado.

It appears that to possibly operate as a Corporation, to distribute profits from an anticipated "bumper crop" so that the individual stockholders could negotiate and attempt to save themselves, and for that matter for the Corporation to defend its own position, the liquid assets, for want of a better term, are necessary.

On the other hand, tying up the crop by a receiver effectively stops that plan.

We believe the recitation of the situation, even though only partial, is sufficient to demonstrate the reason why an appeal is not an adequate remedy, and that an extraordinary remedy is proper. Therefore we denied the Motion to Quash.

On September 15, 1965, we held that a receivership, in light of the foregoing facts, was unauthorized as provided for under section 93-4401, R.C.M.1947, and previous decisions of this Court. The following provides the foundation for our Order setting aside the appointment, by the respondent district court, of a receiver for relator corporation.

This court has on a number of occasions in the past, vacated the appointment of a receiver. State ex rel. Thornton-Thomas Mercantile Co. v. District Court, 20 Mont. 284, 50 P. 852 (1897);

State ex rel. Johnston v. District Court, 21 Mont. 155, 53 P. 272 (1898).

The demand of any party for appointment of a receiver is generally very carefully considered by the courts, for this is a "drastic" remedy which deprives the lawful owner of property the right to manage and control his own interests. As a result, " '[The] power to appoint a receiver is to be exercised sparingly and not as of course. A strong showing should be made and even then the authority must be exercised with conservation and caution.' Hickey v. Parrot S. & C. Co., 25 Mont. 164, 64 P. 330." Brown v. Erb-Harper-Rigney Company, 48 Mont. 17, 27, 133 P. 691, 694 (1913). (See also: Little v. Little, 125 Mont. 278 at 284, 234 P.2d 832 (1951) and Scholefield v. Merrill Mortuaries, Inc., 93 Mont. 192, 205, 17 P.2d 1081 (1932)). The general rule is also stated that if the desired outcome may be achieved in any other way, rather than through the appointment of a receiver, then this course should be followed. Hartnett v. St. Louis Min. & Mill. Co., 51 Mont. 395, 153 P. 437 (1915).

In reviewing the facts of the case presently under consideration it appears the bank could easily have followed to conclusion, the usual legal procedure of suing to foreclose the pledges on the stock, as well as attaching moneys due the debtor shareholders from the corporation. The contention that the value of the stock would be substantially lessened if a receiver was not immediately appointed to oversee the corporate operators seems hollow and unwarranted in view of the substantial value of the corporation assets, and the testimony given regarding Krull's and Treadaway's attitude toward the outstanding mortgage they held against the valuable 1965 crop. Further, nowhere is it indicated that the corporation or any of its stockholders are or were insolvent, which might have lent some weight to the Bank's fear of loss.

Also, it should be noted that a receivership is only an auxiliary remedy, there is no such thing as an action for ap-

pointment of a receiver (Allen v. Montana Refining Co., 71 Mont. 105, 227 P. 582 (1924) when the primary function is one of protecting property in litigation "for the benefit of the person who may ultimately be found entitled thereto." Pereira v. Wulf, 83 Mont. 343, 347, 272 P. 532, 533 (1928). In the instant case it is apparent the Bank had no desire to take complete ownership of the corporation, but only to gain control for a period of time thereby maintaining or increasing the value of the corporate stock it held as security for loans made to individual shareholders of the corporation.

It is thus obvious the corporation is not indebted to the Bank, but only a few of the shareholders are so indebted. There is no auhtority which allows the appointment of a receiver in a situation such as this, which, in effect, makes the corporation liable for its shareholder's debts when the corporate stock is used as security for a personal obligation.

Even if it could be contended that the relator corporation was indebted to the Bank there would be no grounds for appointment of a receiver. The original complaint, out of which the present action grew, indicates that the Bank was only interested in collection of a debt (and maintaining its security in the process), secured by pledges of stock certificates in relator corporation, owned by the individual debtors. The law in Montana does not allow a receiver to be appointed, under R.C.M.1947, § 93-4401, for the property of a debtor in an action on debt. This court first laid down the rule in State ex rel. New York Sheep Co. v. District Court, 14 Mont. 577, 37 P. 969 (1894), and has maintained this position to the present time. In Scholefield v. Merrill Mortuaries, Inc., supra, 93 Mont. at p. 207, 17 P.2d at p. 1084, the court, citing the New York Sheep Co. case, declared that "as far back as 1894 this court carefully analyzed each of its six subdivisions [Rev. Codes 1921, now R.C.M.1947, § 93-4401] to determine whether any authority could be found therein for the appointment of a receiver in an action on debt; it declared that no such authority

exists under the law of this state, or can be found in the 'text or context' of the statute."

A more recent case, Little v. Little, 125 Mont. 278, 234 P.2d 832 (1951), maintains the same view.

For these reasons we ordered the receivership created by the district court to be dissolved, vacated and set aside.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES JOHN C. HARRISON, DOYLE and ADAIR concur.