No. 83-141

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

FAYE ANN MADDOX,

Plaintiff and Appellant,

-vs-

FRANK A. NORMAN, JR., and GLORIA E.
NORMAN, & NORMAN RANCHES, INC.,

Defendants and Respondents.

APPEAL FROM: District Court of the Eighteenth Judicial District,
In and for the County of Gallatin,
The Honorable Thomas Olsen, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Berg, Coil, Stokes & Tollefsen; Ben Berg,
Bozeman, Montana

For Respondents:

Moore, Rice, O'Connell & Refling; Perry J. Moore,
Bozeman, Montana

Submitted on Briefs: May 26, 1983

Decided: SEP - 8 1983

Filed: SEP 8 - 1983

*Ethel M. Harrison*

Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Plaintiff appeals from the judgment of the Eighteenth Judicial District Court, Gallatin County, ordering her to transfer to Norman Ranches, Inc. her 75 shares of stock in that corporation in return for $20,000 and 20 acres of land. We affirm in part, reverse in part, and remand for further proceedings.

The issues are:

(1) Should the District Court have appointed a receiver to liquidate the corporate assets and distribute the proceeds?

(2) Did the District Court have power to compel plaintiff to sell her stock?

(3) Were the findings of the District Court supported by substantial evidence?

The Norman family ranch was incorporated in 1961. No assets were transferred to the corporation until December 20, 1963, when Frank Norman, Sr. (Frank Sr.) deeded approximately 1140 acres of land to the corporation. The ranch belonged to and had been operated by the Norman family for nearly 100 years. Frank Sr., who died July 28, 1980, was the father of defendant Frank Norman, Jr. (Frank Jr.), plaintiff Faye Maddox (Faye), and T. Donald Norman (Donald). Donald was originally a plaintiff in this action, but after settling with defendants was dismissed as a party. Frank Jr.'s wife, Gloria Norman (Gloria), is also a defendant.

Originally, Frank Sr. held 997 of 1000 outstanding shares of Norman Ranches stock, and Frank Jr., Donald and Gloria each held one share. In 1970 Frank Sr. gave an additional 410 shares to Frank Jr., 75 shares to Faye, and 74 shares to Donald. At the same time, Frank Sr. executed a contract to sell his remaining 438 shares to Frank Jr.

Those shares were transferred to Frank Jr. on February 13, 1980, after the purchase price had been fully paid. At the commencement of this action, ownership of Norman Ranches was:

| | |
|---|---|
| Frank Norman, Jr. | 849 shares |
| Gloria Norman | 1 share |
| Faye Maddox | 75 shares |
| T. Donald Norman | 75 shares |

Faye and her husband lived and worked on the Norman ranch in 1946 and 1947, but in 1948 left the ranch and the state because they "couldn't make a living." Frank Sr. moved to Bozeman in 1968 and to Lacey, Washington in 1974. Faye testified that Frank Sr. was not involved in the ranch operation after leaving the ranch in 1968, but Frank Jr. testified that Frank Sr. continued to control the operation, returning in the summers to do light work and otherwise phoning weekly to discuss ranch decisions. Although after 1974 Frank Sr. and Faye both lived in Washington and had "very close contact," Faye was not informed until 1979 that her father had given her 75 shares of corporate stock.

Beginning in 1978, the ranch affairs were handled by a new accountant and a new attorney. Frank Jr. and Gloria testified they had previously depended on the corporation accountant to prepare tax returns and the corporation attorney to prepare and mail the required notices. Faye, however, did not receive any notice regarding corporate matters. When Frank Jr. and Frank Sr. applied for a corporation loan in 1970, Faye was listed on the application as a shareholder. In November, 1979 Faye received her first annual shareholders' meeting notice. In 1979 and each successive year, she attended annual corporation meetings.

No separate corporate records were kept by defendants prior to 1978. No separate journals, ledgers, balance sheets

3

or bank accounts were prepared or maintained. On advice of the new accountant in 1978, a separate corporate checking account was established and separate corporate accounting mechanisms were adopted. The new accountant testified that a very thorough ledger had been kept in which all transactions were posted, but this ledger did not distinguish corporate from personal transactions. This ledger was not introduced at trial by either party. The accountant did testify there had been no apparent attempt to conceal any financial matters. However, no records were introduced at trial to account for corporate transactions from 1970 to 1978.

In 1970 the Federal Land Bank loaned Norman Ranches $80,000 to pay for cattle, land and operating expenses. Proceeds of the loan were in part applied to repay the balance of a loan used to purchase the "Gervais" section. Title to this parcel of land passed to Frank Jr. rather than to the corporation. Frank Jr. testified that the corporation had merely loaned him that amount, but no evidence of such a loan was presented. Corporate lands originally were subject to a mortgage on the $80,000 loan, although they were later released from the mortgage. Loan payments were not in default, but it was not shown if payments were made with Frank Jr.'s personal funds or with corporate funds. Most of the balance of the $80,000 was used to purchase yearling heifers in Frank Jr.'s name. From 1971 to 1979 calves were sold and proceeds were deposited in the account of Frank Jr. and Gloria, or Frank Sr. No showing was made of reimbursement to the corporation for the money used to purchase the yearling heifers.

Beginning in 1966, corporate lands were farmed by Frank Jr. under a 1/3 - 2/3 crop share agreement. From its 1/3 share of the crop, the corporation was responsible for

4

payment of real estate taxes on corporate land, 1/3 of the seed grain planted, 1/3 of the fertilizer, 1/3 of the weed control, and all material for repair or construction of fences. In addition to providing the balance of seed, fertilizer and weed control, Frank Jr. as lessee provided all machinery for cultivation and harvesting. He was required to deliver all grain to the elevator. No showing was made that the corporation received its share of hay or grain. Frank Jr. kept no separate records of corporate shares of grain or hay. Proceeds from the sale of crops were deposited to the personal account of Frank Jr. and Gloria, or Frank Sr. From 1966 to 1977 no money was deposited in any corporate account. No amounts were entered in any separate ledger for grain or hay production under the crop share agreement. A summary of net lease income, based upon estimates prepared by the corporation's accountant in 1979, showed the corporate net lease income for that period as $76,744 or $48,257, depending on tax treatment.

Further, two houses on a portion of the ranch known as the "Gray place" were rented beginning about 1977. Rent income was deposited in Frank Jr.'s account. No showing was made that the corporation received any of the rent income.

Faye attended the December 6, 1979 annual shareholders' meeting for Norman Ranches. At the meeting, Faye demanded an accounting for the income and expenses of the corporation from its beginning to date. At the February 1, 1980 meeting, Faye and Donald each received certificates representing their shares. The summary of net lease income was presented for examination and Frank Jr. briefly described the nature and cost of various corporation improvements. Faye's attorney requested that a detailed written statement be submitted and that defendants provide a detailed written accounting for the

5

$80,000 loan proceeds. No accounting was made. At the next annual meeting on April 2, 1981, Faye requested and it was agreed that an appraisal be made of the corporate ranch property, the Gervais section and items of equipment and machinery belonging to Frank Jr. The appraisal valued the ranch property and improvements at $640,000, the Gervais section at $160,000, and items belonging to Frank Jr. at $46,008. The appraisal detailed the character and use of ranch lands. Based expressly upon present agricultural use and inclusion in the ranch unit, the appraiser set per-acre values for each type of ranch land. The appraisal was not of the corporation as a whole, but included primarily the ranch. None of the corporate liabilities or other assets were mentioned. In fact, the overall financial position of the corporation has not been established.

The parties met on September 30, 1981 to discuss settlement of the dispute and possible purchase of plaintiffs' shares by the corporation. An agreement was reached by which defendants agreed to pay $175,000 for the 150 shares owned by Faye and Donald. The payment was contingent upon defendants obtaining financing within 30 days. They could not, and the agreement lapsed.

Plaintiffs filed suit on November 2, 1981. Plaintiffs alleged misapplication and waste of corporate funds in that Frank Jr. and Gloria had used corporate assets for "personal benefit and gain." Plaintiffs asked the Court to appoint a receiver to liquidate the corporate assets and distribute the proceeds. On November 24, 1981, a hearing was held to allow defendants to show cause why a receiver should not be appointed. The Court issued findings and conclusions on December 30, 1981, finding that defendants' conduct "in the past disposition of the corporate share of hay and grain

6

crops and the proceeds of calves and cattle constitutes a possible misapplication and waste of corporate assets." The Court conditionally accepted ("unless evidence indicates otherwise") the $175,000 settlement figure as fair value of plaintiffs' 150 shares. The Court allowed the parties until July 12, 1982 to reach a purchase agreement, otherwise a receiver would be appointed.

At a second hearing on August 2, 1982 the parties sought court approval of a new settlement agreement between defendants and plaintiff Donald. Faye was not involved in the agreement. The Court had ordered that any transaction involving corporate assets must have prior court approval. The settlement agreement provided that Donald would transfer his 75 shares to the corporation in return for $20,000 and 20 acres of land. The agreement was negotiated for Donald by his son Ted Norman, to whom Donald had given power of attorney. A prior offer of $30,000 had been rejected. After hearing testimony that the agreement was fair, reasonable, and voluntarily and knowingly entered into, the Court approved the agreement and dismissed Donald as a party.

At a third and final hearing on December 7, 1982, the Court heard defendants' motion to amend the findings and conclusions of December 30, 1981. Defendants presented evidence that the $175,000 settlement agreement had been contingent upon defendants obtaining financing. Defendants also presented evidence of specific 20-acre tracts comparable in value and aesthetics to the tract conveyed to Donald. Faye presented evidence of tracts valued around $87,500, half the $175,000 settlement agreement. In findings and conclusions dated December 30, 1982, the Court found that the $175,000 agreement had been contingent upon financing and "was nullified" by unavailability of financing; that

7

defendants had settled with Donald, but Faye had refused the same settlement offer; that Faye's stock, being "closely held, seldom sold, [and] unlisted," was difficult to value, but that the settlement with Donald was a "strong indication" of the fair market value of the stock. The Court found two specific tracts comparable in value and aesthetics to Donald's tract, and found that a settlement similar to Donald's was an equitable resolution for Faye. Finally, the Court found that although defendants' conduct was not per forma as to corporate law or the corporation's by-laws, "its informality was not oppressive toward the plaintiff, nor was she defrauded." Furthermore, the Court did not "find the misapplication of this personal-ranch corporation's assets nor waste of them." The Court refused to liquidate, reasoning that the "prodigal in this instance must defer to the one who stayed at home, built the ranch, worked with the father and struggled to a successful ranch unit." The Court ordered that Faye transfer her 75 shares of stock to Norman Ranches in exchange for $20,000 and a 20-acre tract of land comparable to that received by Donald Norman. Plaintiff appeals.

## I.

Plaintiff in substance argues that upon a bare showing of misapplication or waste of corporate assets, the District Court is required by section 35-1-921, MCA to appoint a receiver to liquidate the corporate assets and distribute the proceeds. Plaintiff maintains that because such a showing was made, the District Court erred in refusing to appoint a receiver. We do not agree.

The Montana Business Corporation Act provides that "[t]he district courts shall have full power to liquidate the assets and business of a corporation . . . when . . . the

8

corporate assets are being misapplied or wasted." Section 35-1-921(1)(a)(iv), MCA. The comments on the statute suggest that this section was intended to clarify the dissolution powers of the district courts:

> "Cases differ as to whether a court has power on petition of a shareholder to dissolve and liquidate for deadlock, fraud or mismanagement, in the absence of a statute giving the court such a power.

> "When there is a statutory grant of such a power there are still two factors with which one seeking dissolution must contend: (1) Courts have tended to construe the statutes as discretionary rather than mandatory, even though the language of the particular statute may appear to make it mandatory. (2) Courts have tended to look beyond the language of the statute and into the equities of the situation.

> ". . .

> "This section provides discretionary authority to the district court to liquidate the assets and business of a corporation upon the petition of a shareholder. . .." Official Comment, Annot. to section 35-1-921, MCA (emphasis added).

These comments indicate the drafters of the statute intended to remove existing uncertainty about whether the courts have any dissolution powers and to allow discretionary exercise of those powers. The statute is clearly couched in permissive language. To require dissolution on a showing of bare statutory grounds would be manifestly unjust, because it would dictate the harsh remedy of dissolution regardless of the facts of the case or the consequences.

Liquidation is an extraordinary remedy and the power of the court to appoint a receiver must be exercised with extreme caution. Thisted v. Tower Management Corp. (1966), 147 Mont. 1, 14, 409 P.2d 813, 821. Traditionally, liquidation has been viewed as a remedy of last resort. This view was restated in State ex rel. Iverson v. District Court (1965), 146 Mont. 362, 406 P.2d 828:

> "The demand of any party for appointment of a receiver is generally very carefully considered by

9

> the courts, for this is a 'drastic' remedy which
> deprives the lawful owner of property the right to
> manage and control his own interests. As a result,
> '. . . power to appoint a receiver is to be
> exercised sparingly and not as of course. A strong
> showing should be made and even then the authority
> must be exercised with conservation and
> caution . . ..' [citations omitted] The general
> rule is also stated that if the desired outcome may
> be achieved in any other way, rather than through
> the appointment of a receiver, then this course
> should be followed." Iverson, 146 Mont. at 371,
> 406 P.2d at 832-33, quoting Brown v.
> Erb-Harper-Rigney Co. (1913), 48 Mont. 17, 27, 133
> P. 691, 694.

See also O'Neal, Close Corporations §9.27 (Supp. 1982); 19
C.J.S. Corporations §1454 (Supp. 1979).

We hold that section 35-1-921, MCA is permissive rather
than mandatory, and that district courts are empowered, but
not required, to liquidate when corporate assets have been
misapplied or wasted.

As noted in the Official Comment to section 35-1-921,
MCA, courts look beyond the statutory criteria and "into the
equities of the situation." This Court has held that "in
addition to the bare statutory requirements, there is a
further burden of proving equitable grounds for dissolution."
Fox v. 7L Bar Ranch Co. (1982), ____ Mont. ____, 645 P.2d
929, 935, 39 St.Rep. 862, 871. We reaffirm that holding. In
Fox, we affirmed the dissolution of a close corporation,
finding that deadlock and oppression, two of the statutory
grounds, were present and that the equities clearly favored
dissolution. We emphasized that the dissolution issue is to
be decided on a case-by-case basis. In affirming
dissolution, Fox held there was no adequate alternate remedy:

> "As we have stated, technical satisfaction of the
> deadlock requirements is not enough to warrant
> dissolution. Therefore, regardless of
> [plaintiff's] motives for seeking a dissolution,
> dissolution could not be ordered absent the
> underlying equitable grounds.

> "On the other hand, to disallow a division would
> greatly harm [plaintiff] by making him the victim

10

of corporate formalities. <u>There</u> <u>is</u> <u>no</u> <u>alternative</u> <u>adequate</u> <u>remedy</u>. <u>Fox</u>, 645 <u>P.2d</u> at 936, 39 St.Rep. at 871-72 (emphasis added).

The equitable factors found persuasive in <u>Fox</u> were (1) demonstrated inability of the parties to get along, (2) reasonable expectations of the shareholders, (3) lack of disruption of a going business, (4) lack of injury to the public, (5) harm to shareholders from refusal to liquidate, and (6) lack of adequate alternative remedies. This list is not exhaustive, nor is each of these factors necessarily required in every case. Dissolution actions must be resolved on a case-by-case basis, balancing the underlying equities and eschewing rigid, predetermined rules. This approach is consistent with our prior decisions. As we have noted before in the corporate dissolution context, "[c]ourts of equity are not bound by cast-iron rules. The rules by which they are governed are flexible and adapt themselves to the exigencies of the particular case." <u>Thisted</u>, 147 Mont. at 15, 409 P.2d at 821.

We employed essentially the same flexible approach in Skierka v. Skierka Bros., Inc. (1981), _____ Mont. _____, 629 P.2d 214, 38 St.Rep. 754. There we affirmed the District Court's conditional liquidation order, holding that the Court's finding of oppression was clearly supported by the evidence and that fraud and mistake were also present. Applying <u>Thisted</u>, we deferred to the equitable discretion of the District Court. The equities in <u>Skierka</u> clearly supported liquidation. There, due to actions of the controlling shareholder, plaintiff's reasonable expectations were frustrated, plaintiff was effectively excluded from corporate management, and the shareholders were unable to get along. Even though the equities supported the liquidation remedy, the District Court ordered that liquidation occur

11

only if the parties failed to agree on a division of the corporate assets. Skierka, 629 P.2d at 215-17, 38 St.Rep. at 755-58.

The equities in this case do not support plaintiff's contention that liquidation of Norman Ranches is the proper remedy. Plaintiff claims to have established statutory grounds for dissolution, but has not demonstrated underlying equities which demand the harsh liquidation remedy. Even assuming misapplication or waste, the record contains substantial evidence in support of the trial court's refusal to liquidate. Norman Ranches appears to be a solvent and going business. Frank Jr. and Gloria would be unjustly harmed by liquidation of assets they have worked long and hard to improve. Together they own over 90% of the corporate shares. Moreover, liquidation would not be likely to benefit Faye in a manner consonant with her apparent expectation to get her money out of the corporation quickly. She clearly does not wish to remain in Montana and participate in the ranch operation. The parties are clearly unable to work together. Liquidation of ranch property might take years and might yield a much less satisfactory result than other available remedies. Alternative remedies exist which would resolve the dispute without the adverse consequences liquidation promises to all concerned. Finally, Faye requested in open court a remedy other than dissolution.

We will not disturb the trial court's determination of the dissolution issue unless it is "clearly erroneous." Skierka, 629 P.2d at 222, 38 St.Rep. at 764. We affirm the District Court's refusal to liquidate the assets of Norman Ranches, Inc.

Plaintiff challenges the power of the District Court to compel her to sell her stock. She argues that the sole issue before the District Court was whether to dissolve the corporation, but that the Court, in an effort to compromise, imposed an unwanted agreement upon the parties. We reject this argument.

Our prior decisions have recognized the general equitable powers of district courts over disputes arising among shareholders of close corporations. Thisted, 147 Mont. at 14-15, 409 P.2d at 820-21; Skierka, 629 P.2d at 221-22, 38 St.Rep. at 764; Fox, 645 P.2d at 936, 39 St.Rep. at 871-72. In Thisted, we recognized that power to choose from a broad range of equitable remedies is necessary to resolve disputes of this nature: "[b]y [their] very nature, intracorporate problems arising in a close corporation demand the unusual and extraordinary remedies available only in a court of equity." 147 Mont. at 14, 409 P.2d at 820.

Accordingly, a court sitting in equity is empowered to determine the questions involved in a case and "do complete justice." Sawyer-Adecor International, Inc. v. Anglin (1982), ____ Mont. ____, 646 P.2d 1194, 1202, 39 St.Rep. 1118, 1127; Link v. State (1979), 180 Mont. 469, 483, 591 P.2d 214, 222. This includes the power to fashion an equitable result. Rase v. Castle Mountain Ranch, Inc. (1981), ____ Mont. ____, 631 P.2d 680, 687, 38 St.Rep. 992, 1000.

Plaintiff argues that the District Court converted this action to dissolve and liquidate a corporation into something akin to specific performance of a contract contrived by the Court. We do not agree. Although the District Court may have improperly relied upon the settlement figure reached by

defendants and Donald, as determinative of the value of plaintiff's 75 shares, the District Court did not make a contract for the parties. Plaintiff cites Horst v. Staley (1936), 101 Mont. 543, 54 P.2d 876, for the rule that courts may not make contracts for the litigants. But in Horst the dispute was whether the parties had made a certain agreement. Plaintiff claimed they had; defendant denied that any agreement had been reached. In attempting to compromise the positions of the parties, the trial court disregarded the allegations and the parties' proof and created an agreement with terms midway between the parties' positions. Horst, 101 Mont. at 548-49, 54 P.2d at 878. Here, plaintiff asked the District Court to order the stock sale. The Court simply assigned a value to the shares that was unsatisfactory to the plaintiff. Although plaintiff's argument begins with the assertion that the District Court is powerless to compel the stock sale, her argument does not address that issue. Instead, it is aimed at undermining the District Court's valuation of her stock. The District Court did not impose a "contrived" contract upon the plaintiff.

Although this Court has never ruled directly upon the question, the decisions of other jurisdictions have recognized and approved the fashioning of equitable remedies less drastic than dissolution, including but not limited to ordered sales of stock at a fair price. Fix v. Fix Material Co., Inc. (Mo. 1976), 538 S.W.2d 351, 357; Baker v. Commercial Body Builders, Inc. (Or. 1973), 507 P.2d 387, 395-96; Alaska Plastics, Inc. v. Coppock (Alaska 1980), 621 P.2d 270, 274-75. In Coppock, the plaintiff sought dissolution but the trial court ordered defendants to purchase plaintiff's shares. The Alaska Supreme Court summarized the case law on this issue and restated the

14

rationale supporting the fashioning of equitable remedies less drastic than liquidation:

> "Liquidation is an extreme remedy. In a sense, forced dissolution allows minority shareholders to exercise retaliatory oppression against the majority. Absent compelling circumstances, courts often are reluctant to order involuntary dissolution. [citations omitted] As a result, courts have recognized alternative remedies based upon their inherent equitable powers. Thus in Baker, interpreting a statute substantially similar to AS 10.05.540, the court authorized numerous alternative remedies for oppressive or fraudulent conduct by the majority. Among those would be:
>> 'An order requiring the corporation or a majority of its stockholders to purchase the stock of the minority shareholders at a price to be determined according to a specified formula or at a price determined by the court to be a fair and reasonable price.' (footnote omitted).
>
> Baker, 507 P.2d at 396. The same court applied that remedy in Delaney v. Georgia-Pacific Corp., 278 Or. 305, 564 P.2d 277, 288-89 (1977)."
> Coppock, 621 P.2d at 274-75 (emphasis added).

The Court found however that the stock purchase remedy was not appropriate under the facts of that case.

The stock purchase remedy was applied in Delaney, where the Oregon court found that remedy appropriate in light of "'the facts of the case and the nature of the problem involved. . .'" Delaney, 564 P.2d at 288, quoting Baker, 507 P.2d at 395. The case was remanded for a proper determination of value. These cases clearly support the power of the District Court on appropriate facts to order the purchase or sale of minority shares. We are persuaded by the rationale and holdings of these decisions. Plaintiff has not cited, nor does our independent research disclose, any authority to the contrary. Indeed, the cases cited do not seriously question that courts have such power, only whether its exercise is appropriate in the particular case.

We hold that the District Court had power to order the purchase and sale of Faye's stock.

Plaintiff and defendants are clearly unable to cooperate in the management of Norman Ranches. It does not appear from the record that Faye desires any participation in the ranch operation. Faye asked the District Court to award her money and land in exchange for her shares. She has not expressed any desire to remain a shareholder or participate in the ranch operation, except insofar as necessary to withdraw her share from the corporation. Norman Ranches appears to be a successful family ranch and, barring dissolution, is likely to remain so. The stock purchase by defendants allows Faye her rightful share of the corporation. It also allows the ranch to continue operating without unfair interruption. It allows defendants to enjoy the rightful fruits of their labors on the ranch while still allowing a full accounting for corporate funds. In short, the stock sale remedy answers the equities and demands of the case. We affirm the District Court's use of the stock sale remedy in this case.

III.

The final issue is whether there was substantial evidence to support the findings of the District Court upon which judgment was entered ordering Faye to transfer her 75 shares of stock in return for $20,000 and 20 acres of land. The record does not show all assets and liabilities of the corporation. While the District Corut found that corporate assets were appraised at $640,000, the record shows that this value is limited to the corporate real property. The record does not disclose the net value of the corporation. Section 35-1-812(6)(c), MCA, in providing a method for dissenting shareholders to force a purchase of shares, requires as a part of the value determination that the corporation provide a balance sheet showing assets and liabilities. Such information is no less crucial in the present case.

16

Determination of the assets of the corporation also requires an accounting by Frank, Jr. for corporate funds from 1970 to the date of valuation. No accounting is shown of corporate rental income, lease proceeds or loan proceeds. Liabilities of the corporation, if any, must also be shown by appropriate evidence. It may be that defendants have some claim in that regard for labor and improvements.

Next, we note that the District Court relied upon defendant's settlement with Donald as determinative of the value of Faye's shares, rejecting the earlier $175,000 valuation by agreement. While the $175,000 agreement lapsed for lack of financing, it does not eliminate that agreed value as a factor to be considered in determining share value. Defendants argue that reliance on Donald's settlement to determine value was proper, relying on cases treating arms-length transactions in the normal course of business as the basic criterion of market value. The record raises a question as to whether or not the settlement with Donald was an arms-length transaction, since it involves a participant in the court action. It appears that the agreed value of $175,000 for all the shares or $87,500 for Faye's shares was evidence which should have been considered by the District Court.

Finally, the record fails to show the value of the 20 acres of land ordered to be exchanged. The initial appraisal was based upon a value per acre for an operating 1,140-acre ranch. That appraisal expressly stated that the values were applicable only under the existing program of farm use and were invalid for use in connection with any other appraisal. As a result, the record fails to show the value of the 20 acres which the defendant proposed to transfer along with $20,000 to Faye and also fails to show the value of the lands

which Faye proposed to be transferred to her at a value of $87,500. On further consideration, the District Court should require appropriate evidence to establish the value of any land which is ordered to be exchanged.

The case is remanded for further proceedings consistent with this opinion.

_____
Justice

We concur:

_____
Daniel J. Shea

_____
John Conway Harrison

_____
John C. Sheehy

_____
L. C. Gulbrandson
Justices

18