JUSTICE SHEEHY,
dissenting:
*146 The majority opinion is completely out of focus with the case which was tried in the Cascade County District Court, and on which the District Court entered judgment.
For example, an essential element of the District Court’s findings is that on April 16,1986, at a meeting between Thomas, as president of T & D Properties, and Daniels, Thomas agreed that T & D Properties would purchase Daniels’ stock (31/2 shares) in T & D Properties at fair market value. The majority opinion sets that finding aside. The majority opinion relies in part on a portion of Thomas’s testimony, without any reference to the other testimony in the record which supports the District Court finding.
In setting aside the District Court’s finding that Thomas had agreed to buy the T & D Properties stock from Daniels, no reference or mention is made by the majority opinion of a second finding made by the District Court that on May 13,1986, the parties met, and again agreed on the method to be used to determine the value of the T & D Properties stock. The District Court found:
“23. On May 13,1986, Daniels and his accountant, Dan Eigenman, met with Thomas and his accountants, Dale Grabofsky and Curt Ammundson, at the offices of Hamilton and Misfeldt in Great Falls. The only disagreement with regard to the termination agreement was the value of the T & D stock. The dispute centered around the value of certain real property including the land known as Western Properties and the Great Falls office building. There was no major disagreement about the value of the other assets of T & D. Both parties agreed to use the method of determining the assets less liabilities, with a net asset value to be divided by the total issued shares of T & D and that figure multiplied by Daniels’ three and V2 shares.”
On April 16,1986 (the District Court stated the date to be April 17, 1986) Thomas and Daniels met in Great Falls and there entered into a mutual agreement for Daniels to terminate his employment. In that meeting, they mutually concluded what would happen with respect with the T D & H stock owned by Daniels, and also the T & D Properties stock which he owned. The evidence with respect to that conversation from Daniels is:
“Q. Well, let’s tell the court then what Mr. Thomas said to you with regard to your leaving the employment.
“A. Well, one of my concerns, you know, was that my training and everything was in engineering, my education and all my experience, and I mentioned, you know, how are we going to resolve the issues, you know, that needed to be resolved. And, Tom offered first of all, *147 you know, as far as T D & H stock, he would waive the clause that requires I only get 75% of the stock. And, he said, you know, you have been a good employee for a long time. We have had a good relationship. He said we can close this out, you know, we can get any information we need from you on jobs that are ongoing. If you cooperate, you know, and take care of those loose ends, we will waive that clause.
“Q. All right. What did he say?
“A. We discussed very briefly the T & D Property, we also touched on retirement plans. T & D Properties said we will pay full fair market value for that. We will turn the pension plans over to you whatever you wish to do. I think we mentioned insurance that I would have an option to pick that up on my own.” (Emphasis added.)
The majority opinion recites that there was no offer and no acceptance but the testimony is contrariwise. Mr. Thomas testified:
“Q. (By Mr. Lynch) Now, Mr. Daniels, you agreed to leave an employment with the firm of Thomas, Dean & Hoskins, did you not?
“A. Based on the conditions that were discussed on the 16th of April.” (Emphasis added.)
Following the April 16, 1986 meeting, Thomas met with his attorney for the purpose of making up a formal written agreement that related to that meeting. However in that agreement, instead of providing for fair market value for the T & D Properties stock, Thomas inserted a figure of $20,428. That had not been agreed upon by the parties at the April 16 meeting. In connection with that, Daniels testified:
“Q. Did Mr. Thomas, before sending you this check, ever consult with you or talk with you about the results of the stock?
“A. It was discussed on the 16th of April.
“Q. And what was your impression at that time?
“Q. That I would be paid a fair market value for the stock.”
The majority opinion to the contrary notwithstanding, there was adequate, substantial and competent evidence to support the findings of the District Court that agreement had been reached that Daniels would receive fair market value for the T & D Properties stock.
The District Court also determined that that agreement included: “Determining the fair market value of the T & D Properties stock contemplated the use of an appraiser to value the assets (real property) of T & D.” Thomas refused to get an appraiser, to pay for an appraiser, and told Daniels that if an appraiser was obtained, he would not regard it or rely on it. Thus Thomas led Daniels to believe *148 at the April 16 meeting that he would receive fair value for his T & D Properties stock, as a part of the termination agreement, but later refused to perform that part of the agreement by any reference to a fair appraisal of what the market value of the T & D stock should be.
When I say that the majority opinion is out of focus with the case that was tried in District Court, I mean that the opinion as promulgated has no relation to the situation faced by the District Court upon which it made a judgment. For that reason, I will discuss what the District Court found, and the implications that arise from the legal relationships that the court found.
Thomas, as president and director of T & D Properties, owed Daniels, a minority stockholder, a fiduciary obligation. At all times at trial, Thomas recognized he was a fiduciary. There was no argument on that subject. Out of the fiduciary relationship, the District Court concluded that Thomas, as fiduciary, was bound to act in the “highest good faith towards his beneficiary and not to obtain any advantage therein over Daniels by the slightest misrepresentation, concealment, threat or adverse pressure of any kind.” Skierka v. Skierka Brothers, Inc. (1981), 192 Mont. 505, 629 P.2d 214; Section 72-20-201, MCA (Repealed, 1989). The fiduciary was bound not to have or acquire an interest which would be adverse to the interests of his beneficiary without immediately informing him of it and removing himself if requested. The fiduciary had an affirmative duty to make sure that the beneficiary retained a position of equity; and the fiduciary was obligated in all transactions with his beneficiary to refrain from any unfair persuasion for the purpose of obtaining an advantage over his beneficiary.
The majority state that the trustee statutes are not applicable to a fiduciary when a relationship between two close corporation shareholders does not involve an executor of an estate of the beneficiaries. That is entirely an incorrect statement of law. When a fiduciary relationship exists, the laws applicable to the fiduciary are those relating to constructive fraud. Bradbury v. Nagelhus (1957), 132 Mont. 417, 319 P.2d 503. The statute states that constructive fraud involves “any breach of duty which, without an actually fraudulent intent, gains an advantage to the person at fault or anyone claiming under him by misleading another to his prejudice.” Section 28-2-406(1), MCA. Thus, a constructive trust arises under operation of law and is valid. Section 72-33-208(3), MCA; § 72-33-220, MCA. When the majority state that the fiduciary duty between stockholders of a close corporation is one of the “utmost good faith and loyalty,” the majority *149 in reality are stating the duties of a trustee in a constructive trust. There can be no argument in this case that a fiduciary relationship exists between Thomas, the corporation, and the minority shareholder. The proposed findings of fact submitted by Thomas in this case accepted the premise that Thomas was a fiduciary. No issue of any kind was raised in the case that his status was any less than a fiduciary. The parties agreed a fiduciary relationship existed.
When the majority then insert the “business judgment” rule, they erroneously mix two incongruent concepts. The “business judgment” rule applies to the acts of directors and officers to hold them free from liability for honest errors, for mistakes of judgment, when they act without corrupt motive and in good faith, that is for mistakes that may properly be classified under the head of honest mistakes. Ski Roundtop, Inc. v. Hall (1983), 202 Mont. 260, 658 P.2d 1071, 1078 (1983). The “business judgment” rule applies to officers and directors acting in a corporate capacity, when no fiduciary relationship is involved. When a fiduciary status is established, the actions of officers and directors are examined, not under the “business judgment rule” but rather whether the fiduciary exercised the utmost good faith and loyalty, in this case towards all of the shareholders of T & D Properties.
The majority resort to a “balancing test,” contending that Thomas5 duty was to protect the other shareholders by not paying Daniels a price for his shares that the corporation could not afford so as not to harm the other shareholders of the corporation. There is absolutely no proof of this in the record. In any event, there could not be any such proof because a fair market value of Daniels5 stock would likewise be a fair market value of all of the other shareholders’ stock. The majority talk about balance; it is a see-saw, tipped on one end against Daniels.
Thomas breached the duties of a fiduciary. The court concluded he had violated his duty by inducing Daniels to leave his employment through representations that Daniels would be paid 100 percent of the value of his stock in the T D & H corporation, and the “fair value” of his stock for the T & D Properties corporation. Thomas intended to force Daniels to accept an unfair price for his T & D Properties stock in order for Daniels to receive the full value of the T D & H stock. (Thomas had written that the T D & H stock anti-competition clause would be waived if Daniels would accept Thomas’valuation of the T & D Properties stock.) Although Thomas had authority from his board of directors to offer $35,000 for the T & D Properties stock to *150 Daniels, he never transmitted that offer to Daniels and adamantly stayed on the $25,000 figure. Thomas stood to benefit from his dealings with Daniels, because he owned 39 percent of the stock in T & D Properties. For a fiduciary to gain any advantage through breach of a duty constitutes constructive fraud. Deist v. Wachholz (1984), 208 Mont. 207, 678 P.2d 188, 193; Ryckman v. Wildwood (1982), 197 Mont. 154, 641 P.2d 467, 472.
The District Court found that at the April 16, 1986 meeting, Thomas had agreed to waive the anti-competition provision of the share-purchase agreement that applied to the T D & H stock.
The District Court further found that Daniels, relying upon the statements made by Thomas concerning the waiver, began an engineering business in Belgrade on July 1, 1986. Thereafter Thomas would not authorize a waiver of the anti-competition clause unless Daniels agreed to accept the valuation of the T & D Properties stock provided by Thomas. Indeed, by letter dated September 17, 1986, Thomas informed Daniels that the full payment of the value of Daniels’T D & H stock was contingent on his accepting Thomas’ value of Daniels’T & D Properties stock. From all of the problems facing Daniels, the District Court found that he was stranded in a closely-held situation which was hostile and adverse to him as a minority shareholder. The District Court found that T & D Properties and Thomas agreed to pay fair market value to Daniels for Daniels’ shares of stock in the corporation, but that Thomas’ refusal until the time of trial to use an appraiser or recognize one was oppressive and in violation of Thomas’ fiduciary duty. It was on that premise that the District Court found that the only remedy proper was to order the corporation to purchase Daniels’ stock at fair market value. Such a purchase would not result in any disruption of the corporate business nor any injury to the public, and would promote the best interest of T & D Properties.
The majority opinion intimates that neither the District Court nor this Court can grant an equitable remedy to a minority shareholder in a close corporation unless the minority shareholder has asked for liquidation. That intimation is an unnecessary extension of corporate law and has no basis in the case which the majority cited in support. For example, in Maddox v. Norman (1983), 206 Mont. 1, 669 P.2d 230, the minority shareholder petitioned for liquidation, but the District Court found and this Court agreed that the equities did not support his contention that liquidation is a proper remedy. Instead, this Court *151 stated that the equitable powers of district courts in disputes among shareholders of close corporations allowed the court to fashion reasonable equitable remedies. This Court said:
“Our prior decisions have recognized the general equitable powers of district courts over disputes arising among shareholders of close corporations (citing authority). In Thisted, [v. Tower Management Corp. (1966) 147 Mont. 1, 409 P.2d 813,] we recognized that power to choose from a broad range of equitable remedies is necessary to resolve disputes of this nature: ‘[b]y [their] very nature, intracorporate problems arising in a close corporation demand the unusual and extraordinary remedies available only in a court of equity' 147 Mont. 14, 409 P.2d at 820.
“Accordingly, a court sitting in equity is empowered to determine the questions involved in a case ’and do complete justice.’ (Citing authority.) This includes the power to fashion an equitable result. Rase v. Castle Mountain Ranch, Inc. (1981), _Mont._, 631 P.2d 680, 687, 38 St.Rep. 992, 1000.”
206 Mont. at 14, 669 P.2d at 237.
Thus the right of the minority shareholder to get equitable relief from oppressive conduct by controlling shareholders is not dependent on a request for liquidation, but whether equity is necessary to fashion a just resolution. The view of this Court expressed in Maddox, Skierka, and other cases, is in tune with the Montana Close Corporation Act, adopted in 1987 (§ 35-9-101 et seq.). That Act provides, in § 35-9-501, MCA, that a shareholder in a statutory close corporation could petition the district court for a corporate purchase of his shares if the directors who control the corporation have acted in a manner that was “illegal, oppressive, fraudulent, or unfairly prejudicial to the petitioner.” See Bahls and Quist, The ABA Model Statutory Close Corporation Act: A New Opportunity for “Made in Montana” Corporations, 49 Mont. Law Review, page 66, et seq.
I would therefore affirm the District Court’s holding that Daniels is entitled to have his shares purchased at fair market value and that the fair market value is that found by the District Court. I would make the judgment effective against T. H. Thomas individually and T & D Properties, and not against the other corporation, T D & H. I would find no error in awarding Daniels his appraisal fees. I would deny Daniels’ cross-appeal for attorneys fees.
Next comes the question of how Daniels ought to be paid for his T D & H stock (a separate corporation). The majority opinion finds that *152 the restrictive agreement in the share-purchase agreement adopted by T D & H does not violate the anti-competitive provisions of Montana law. That portion of the majority opinion is clearly wrong.
We repeat the pertinent provision of the shareholder agreement:
“Inasmuch as a shareholder has access to confidential information concerning the corporate business, it is mutually agreed that the compensation for a terminated shareholder who obtains employment with a competitive firm or enters any form of business in competition with the corporation shall be paid for his stock at the rate of 75% (seventy-five percent) of the fair value.”
Under Montana law (§ 28-2-703, MCA) any contract by which anyone is restrained from exercising a lawful profession, trade or business of any kind is to that extent void, subject to certain exceptions not pertinent here. The provision above quoted of the share-purchase agreement restrains Daniels from his lawful profession as an engineer by penalizing him up to 25% of the value of his T D & H stock. The District Court found that “there is no limitation in the anti-competition provision therein as to the duration of its prohibition or the territorial scope of his prohibition. The provision, read literally, prohibits the plaintiff from competing with the defendants anywhere in the world and until the end of time.” Clearly, the District Court understood what it read in the provision.
The majority opinion contends that the anti-competition provision is limited as to time because another provision of the share-purchase agreement provides that payment for stock shall be made to a shareholder 120 days after the audit following the date of termination, but in no case sooner than 240 days after the date of termination. Obviously, as the District Court found, that provision relates to when payment is to be made and not to the duration of the anti-competition provision. Two things militate against the majority opinion’s position: (1) At the time of the trial, more than 240 days following the termination, Thomas was not willing to waive the anti-competition petition provision, and pay Daniels 100 percent of the value of his stock, and (2) if the anti-competition provision is valid, as the majority opinion contends, it could be specifically enforced even after payment for the stock that had been made under the other provision of the share-purchase agreement. We should declare the anti-competition provision of the share-purchase agreement void. Dobbins, DeGuire & Tucker v. Rutherford, MacDonald and Olson (1985), 218 Mont. 392, 708 P.2d 577; J T Miller Company v. Madel (1978), 176 Mont. 49, 575 P.2d 1321.
*153 At the outset, I stated that the majority opinion was out of focus. The majority have set aside the District Court’s findings of fact without finding them clearly erroneous; and, they have found valid a clearly anti-competitive provision of the share-purchase agreement. On these points the majority have diverged from rather than converged on previous decisions and statutory law, and made vague and blurry for future cases the position of this Court on these points.
JUSTICE HUNT concurs in the foregoing dissent of JUSTICE JOHN C. SHEEHY.